**Louis LUKETICH, Employee, Plaintiff-Respondent,**

v.

**KREY PACKING COMPANY, Employer, Self-Insurer, Defendant-Appellant.**

No. 32491.

St. Louis Court of Appeals.

Missouri.

Feb. 21, 1967.

Motions for Rehearing Denied March 17, 1967.

R. C. Reis, St. Louis, for defendant-appellant.

Harry J. Nichols, St. Louis, for plaintiff-respondent.

BRADY, Commissioner.

This appeal arises out of a claim for workmen's compensation. The circuit court affirmed the decision of the Industrial Commission and the self-insured employer appeals. The parties will be referred to as "the employee" and "the employer". We will refer to the Industrial Commission by that title and sometimes as "the Commission".

■ We are first confronted with two attacks upon the jurisdiction of this court which must be disposed of. The first of these arises from the employee's contention the employer failed to file a timely application for review from the award of the referee. The filing of an application for review of a referee's award in a Workmen's Compensation case within the time prescribed by the statute provided for such a review is jurisdictional. Tabb v. McGinley, Mo.App., 313 S.W.2d 745. Of course, if the Commission had no jurisdiction to review the referee's award then neither the circuit court nor this court has jurisdiction to consider the appeal from the award of the Commission. In Tabb v. McGinley, supra, this court (construing the ten-day provision then contained in § 287.480, RS Mo 1949, V.A.M.S.) held that an application for review is made on the date it is received by the Commission rather than when it is deposited in the mail. In the instant case the referee's award was not made until March 22, 1965. The employee's application for review was received by the Industrial Commission on April 8th of that year. The employer's application for review was received on April 12th of that year. In 1963 the section dealing with an application for review was amended and "twenty days" was substituted for "ten days". See Laws 1963, p. 410, § 1. It is clear that the employee's application was received by the Commission within the twenty days provided by § 287.480, RSMo 1959, V.A.M.S. It is likewise clear that the employer's application for review was received on the twenty-first day. However, a reference to the calendar for the year 1965 will disclose that April 11th, the twentieth day after the award of the referee, fell upon a Sunday. Under these circumstances the employee's contention is without merit and the employer did file a timely application for review.

■ The employee also contends that we are without jurisdiction in this matter for the reason that, to quote from his motion to transfer this appeal to the Supreme Court, " * * * 'the order and judgment of the Circuit Court' * * * embodies a decision affecting the Treasurer of the State of Missouri * * *." The simple answer to this contention is that regardless of whether that State official was a party to this proceeding prior to the referee's award, he ceased to be such after that time and the decision of the circuit court does not affect the State officer. The record discloses the employee filed his claim against the employer and, to quote from the claim, "State Treasurer, State of Missouri, Second Injury Fund, Jefferson City, Mo." For some reason that cannot be discerned the State Treasurer never raised any question as to the propriety of the proceeding against the Second Injury Fund, filed an answer, and participated in the hearing before the referee. In his award the referee denied the employee's claim for compensation from the State Treasurer as custodian of the Second Injury Fund. In his application for review the employee did not request review of that matter. Neither did the employer. Accordingly, that matter was then finally determined. Whatever may be the effect of the appearance by the attorney for the State Treasurer before the circuit court, that appearance cannot revive an issue which was already finally determined. It should be noted that the employer, appellant in the instant case, raises no issue with regard to the Second Injury Fund. This court has jurisdiction of this appeal.

The facts out of which the employee's claim arose are that he had first had trouble with his back some twenty-four or twenty-five years before this incident when he hurt his back while carrying some trays up a flight of stairs. This injury " * * * wasn't a sudden thing, it was a result of doing this more regularly, this twisting way of walking up the stairs with this weight." As a result he had pains off and on sometimes at intervals of two to three years. Later on, while working as a boner at another meat company, he got a catch in his back and went to the doctor who thought his bad appendix was at least the partial cause and it was removed in 1950 or 1951. He did not lose any time nor did he make a claim because of his back on this occasion. After the appendix operation there was a period of time when he had no pain and then in 1954 he began to have pain again at the lower right side of his back. The pain did not result from any "one particular thing" and after it hurt for a week or so he was examined by Dr. Ford who gave him a brace which he was to wear except when sleeping. He wore this brace regularly for about three months and then, being free of pain, discontinued its regular use although he has been wearing it off and on ever since then. In 1961 or 1962 the trouble in his back began to gradually return without being caused by any specific incident, and he went to see a chiropractor who gave him deep sound therapy. He was able to perform his regular duties and did not lose any work. In a matter of a week or so "it cleared up". In early September of 1962, about one week prior to the incident upon which he bases this claim, he went to see a Dr. Vacca due to "pain in the lower part of my back on the right side." Again this was not caused by any particular incident. Dr. Vacca prescribed medicine for him, took x-rays, examined him, and asked him to continue the deep sound therapy with the chiropractor. On all of these occasions he was without pain for the time between the occurrences, and between them had free movements of all of his limbs.

On September 13, 1962, the day of this accident, the employee went to the employer's first aid room to get some pills as he had some pain in his back. He was wearing the brace Dr. Ford had prescribed for him. Later that day while taking a hindquarter of beef from a conveying rail located about five to six feet from the table where he was to bone it he suffered the injury forming the basis for this claim. The conveying rail was about seven to eight feet high and he put a hand hook held in his left hand into the meat to hold it. There was a truck (cart) furnished for waste and fat to be thrown into and this was parked in the employee's way as he brought the hindquarter from the rail to the boning table. His normal method of removing the quarter would be to take it off the rail, pivot around on the right foot, swing the beef around to the table and drop it there all in a continuous motion. On this occasion the truck was not parked in its usual place but was parked in such a way that had he continued with this motion the handle of it would have struck him on his shin. Seeing this was about to happen, he stopped but " * * * the beef continued to come, and that is when I felt the pain in my back." He dropped the quarter which weighed about 125 lbs. and, falling forward, grabbed onto the truck. He was bent over with the pain which was on the left side of the lower part of his back, and was trying to avoid putting weight on the left leg as when he did so pain ran down it so that "I couldn't stand it." He could not put any weight on his left leg and had to be carried into the first aid room. He sat on a chair there while they gave him a pain shot but " * * * the pain hit me again and I fell to the floor and lost consciousness for a short period of time, and while I was, they picked me up off the floor and put me on the table there in the first aid room." He was taken to the ambulance on a stretcher and by ambulance to St. Mary's Hospital where he remained until September 18. While there he was in traction for almost the entire time and was given deep therapy treatments. He was under the care of Dr. Vacca. He lost two

weeks work and he has worked regularly since his discharge from the hospital. He has been continuing the same kind of work.

The medical evidence given by Dr. Vacca was that he first saw the employee on May 24, 1961; that the employee then complained of back pain of several days duration; that the diagnosis made at that time was lumbar osteoarthritis which was based upon the history of back pain and x-rays of the back which were taken at that time; that he was placed on drugs to decrease inflammation and swelling and was seen again a week later when his condition was improved but the back still had pain. Dr. Vacca next saw the employee on September 10th of 1962 when he complained of similar symptoms in the lumbar area of the back; that on this occasion there was no indication of any disc pathology and the employee was again placed on the same medication as before. Dr. Vacca was cognizant of the type of work the employee was doing and was of the opinion he was able to work. He next saw the employee in the hospital on September 13, 1962. His treatment while in the hospital has already been stated and Dr. Vacca's diagnosis was as follows: "It was my impression while Mr. Luketich had difficulties with his back in the past and recently had some symptoms of his back, there was undoubtedly an aggravation of the back condition by the injury sustained at work September 13, 1962. He has a definite diagnosis of lumbar osteoarthritis, but the acute, severe attack he had on September 13 certainly could have represented an acute ruptured intervertebral disc. While myelograms were not done because of relief of symptoms with conservative type measures, there certainly exists the possibility of the above diagnosis." His final discharge diagnosis was possible herniated intervertebral disc, lumbar osteoarthritis, acute lumbosacral strain or sacroiliac separation. The doctor stated that his diagnosis of a ruptured intervertebral disc was very different from any diagnosis he had made prior to that time.

The employee was also examined by Dr. Ford on March 23, 1964. On that date the doctor's examination showed that the employee had about one-fourth limitation of his back movement accompanied by some back pain. X-rays were made at that time and when compared to later x-rays made on September 23, 1964, the only difference was that the latter x-rays showed a scaliosos convex to the left which was to be expected under the acute state of his back at that time. The doctor testified that his diagnosis as a result of the employee's March visit was degenerative arthritis in the lumbar spine with the diagnosis by history of a ruptured lumbar disc. He further stated that on the basis of aggravation of pre-existing degenerative arthritis and degenerative discopathy, a degenerative disease of the lumbar disc, the employee had fifteen to twenty percent permanent disability of the man as a whole. The doctor's conclusion as a result of the employee's September visit was that the employee now had evidence both by history and on examination of a ruptured lumbar disc on the right and he recommended hospitalization for the purpose of a lumbar myelogram and, depending upon the results of that, probable disc surgery and a possible spinal fusion. Upon being asked a hypothetical question as to the causal connection between the incident and the condition he found, Dr. Ford's opinion was that the accident was " * * * a competent causing factor of the disc rupture on the basis of pre-existing degenerative change in the disc." He explained this diagnosis as meaning that the ligament that contained the disc in the employee's back had some weakness but the trauma caused the disc to protrude or rupture. It was the doctor's opinion that the employee's disability should be thirty to thirty-five percent of the man as a whole. Upon cross-examination and with his recollection refreshed from his records, Dr. Ford also testified that the employee visited him on November 25, December 8 and December 29, 1952, with complaints of lower back pain with pain radiating down the right hip to the thigh. On those occasions

the pain was stated to have begun eight to ten days prior to the earliest visit. The employee also stated that when the attacks of pain became acute one leg would feel longer than the other as a result of his back seeming to slip out of place. The doctor recommended lumbo sacro belt along with medication and made a diagnosis of a ruptured lumbo sacro disc on the right side. He also stated that his examination in September of 1964 reflected a re-injury to the back with the same picture of symptoms that he had found previous to that time. Dr. Ford stated that he could not say that this accident was the sole cause of the employee's back injury as he had consistently maintained that there was some pre-existing disease, but he did state that he attributed the disability he found to the accident that occurred on September 13, 1962. He also stated that with reference to his diagnosis prior to this incident of a disc injury that " * * * In 1952, according to my records, I thought it was the lumbo-sacral disc. It is possible that it was the lumob-sacral (sic) disc then and could be another one now, or could be the same one continuing to cause symptoms after the twenty-seven year period." Dr. Ford testified that in his opinion this incident caused "severe trauma". After making that statement the employer's counsel asked him the following questions and he gave the following answers: "Q. Doctor, in a man, a healthy man with no history of back condition and who lifts beef such as this quarter of beef, weighing approximately one hundred twenty-five pounds daily, and numerous times every day, would this be a severe trauma in your opinion? A. I consider this amount of weight, lifting is certainly a stress, but we define trauma as an abnormal stress and I consider this to be trauma. Q. In a man who had a good back with no symptoms, such as this man had, an incident like this, would that be likely to produce the symptoms that he complained of at the time? A. If the man had a good back and was accustomed to carrying such weights, that would not be likely to produce symptoms, in my opinion."

Dr. George Scheer examined the employee on May 23, 1963. His testimony and examination was given on behalf of the employer. At the time of this examination the employee denied the presence of any symptoms regarding the back or right thigh. The doctor's conclusion was that on the basis of his examination there were no findings on which to base a conclusion the employee had a ruptured disc.

After a hearing the referee made an award to the employee and from his decision both the employer and the employee filed applications for review. Upon review the Industrial Commission found for the employee and awarded him forty weeks at $42.-50 per week as permanent partial disability resulting from the accident of September 13, 1962. The award also included two weeks additional compensation at $47.50 per week as a healing period and the sum of $285.10 for medical aid. It also found the employee failed to make a claim against the Second Injury Fund against which the employee had filed a claim. The circuit court affirmed the award. The employee did not file any appeal from the decision of the Commission as to the Second Injury Fund nor from the decision of the circuit court as to that or any other matter.

Upon reviewing cases of this nature the ultimate issue for our decision is whether, viewing the evidence in the light most favorable to the findings and award of the Commission, the whole record discloses competent and substantial evidence upon which the Commission could reasonably base its decision. Mo.Dig., Workmen's Compensation, ☞1969. The employer contends that such competent and substantial evidence is lacking in the instant case. Its basic theory in this regard is that the employee had a chronic back condition which caused his injury. This contention the employer divides into two separate allegations of error. These are: first, the employee did not carry the burden of proving he had a disability resulting from the accident on September 13th; second,

to quote from its brief, " * * * the incident in question was not such an abnormal or excessive strain as to entitle him to compensation under the law." In essence these allegations present the same basic contention and we will rule them together.

It will serve no useful purpose to extend this opinion with a review of the case law of this jurisdiction with regard to unusual strains. Those interested in the development of that subject may refer to Crow v. Missouri Implement Tractor Co., Mo.App., 301 S.W.2d 423, and in particular to the opinion of the Supreme Court when that case was transferred as found in 307 S.W.2d 401.

■■ The employer relies upon the following language from Brotherton v. International Shoe Co., Mo.App., 360 S.W.2d 108, l. c. 114, " * * * This rules out those injuries which result from the normal stresses and strains of work which are the product of *routine stresses combined with inherent weakness* or bodily defect, chronic disability, or natural causes." (Emphasis supplied.) As the evidence stated herein indicates, there was a serious controversy as to whether the previous condition of the employee's back did, as the employer contends, combine with the stress of this incident to produce the employee's injury. The employee's position is that the previous injury to his back was on the opposite side of his back and that this incident was in fact a new injury. We need not decide that issue. This for the reason that even if we concede, arguendo, the existence of the previous injury and that it combined with another factor to cause this injury, the evidence does not show that this previous injury combined with anything that would bar the employee from compensation. As the employer's own authority (Brotherton v. International Shoe Co., supra) holds, inherent weakness or bodily defects must combine with "routine stresses" in order to defeat the employee's claim. In the instant case there is no evidence that the stress placed upon the employee's back on September-

ber 13, 1962 was a normal or routine stress. To the contrary, the evidence clearly justifies the Commission in finding that the stress was abnormal to the employee's work. Routine stresses, so far as the evidence in the instant case is concerned, would be those incurred by the employee as he took the hindquarter of beef from the rail and pivoting, turned in one motion to place it upon the table. That was the evidence as to how such work was usually and ordinarily accomplished. On the occasion of this injury the waste truck or cart was not parked in the usual manner but was so placed that the employee could not complete his continuous motion of lifting the beef from the rail to the table but had to come to a sudden stop in the midst of that motion. It was this sudden stop that created the abnormal stress.

In this same connection it should be noted that the employer's effort to rely upon an answer given by Dr. Ford cannot stand the scrutiny of a careful reading of the transcript. As pointed out earlier in this opinion, Dr. Ford testified that the incident in question caused a severe trauma and this trauma caused the disc, already weakened, to rupture. In an effort to alleviate the adverse effect of this testimony, counsel for the employer asked a question which would seem to have little if any bearing upon the issues presented by this appeal. It will be recalled that the employer's position throughout this matter was that the employee had a "bad back" prior to the incident of September 13th. Despite this, counsel for the employer asked Dr. Ford a question relating solely to a man with a good back, and now seeks to rely upon the doctor's answer that "If the man had a good back and was accustomed to carrying such weights, that would not be likely to produce symptoms, in my opinion." In view of the employer's basic contention in this matter, as well as the admitted bad condition of the employee's back, such a question and such an answer would seem to be of little value. In any event, this medical witness also testified that the incident of Septem-

ber 13th caused the disc to protrude or rupture in the employee's back; that he attributed employee's disability to the incident of September 13th; and that there could have been an entirely new disc injury which resulted from the incident of September 13th. Such testimony clearly negates any unfavorable inference that might be drawn from the one answer upon which the employer relies.

The employer is correct in stating that this case falls within those recognized by the ruling of Brotherton v. International Shoe Co., supra, but is incorrect in stating the manner in which the case does so. Immediately preceding the language from Brotherton upon which the employer relies it is stated: "We now conclude that the *unexpected and abnormal strain* is the important event. This will *usually* result from the doing of the work in an 'abnormal manner' or in doing work which is not routine, but it is not necessarily so. * * *" That is exactly what happened in this case. The position of the waste cart caused the employee to do this work in an abnormal manner and thus an abnormal stress was placed upon his back. It is only in this manner the case does fall within the rule of Brotherton v. International Shoe Co., supra. In any event, and regardless of whether the pre-existing condition of the employee's back was a contributing cause to his injury or not, it is clear from this record that whatever inherent weakness or *bodily* defect or chronic disability previously existed in the employee's back, and even assuming, arguendo, this condition combined with the incident of September 13, 1962, to produce this injury, nevertheless the employee may still recover. This for the reason that the combination (assuming it existed) was with an abnormal strain.

There remains the testimony of Dr. Vacca to the effect that when he examined the employee three days before this incident there was no indication of any disc pathology; that after this incident occurred his diagnosis was herniated intervertebral disc; and that this was very different from any diagnosis he had made prior to that time. Certainly this evidence supports the finding of causal connection between this injury and the incident of September 13.

The judgment should be affirmed and the employee's motion to dismiss this appeal or transfer it to the Supreme Court is overruled.

## PER CURIAM.

The foregoing opinion by BRADY, C., is adopted as the opinion of the court. The judgment is affirmed and the employee's motion to dismiss this appeal or transfer it to the Supreme Court is overruled.

WOLFE, P. J., and ANDERSON, and RUDDY, JJ., concur.