MARY NAGEL, RESPONDENT, v. GUY A. THOMPSON, TRUSTEE FOR THE MISSOURI PACIFIC RAILROAD COMPANY, APPELLANT.—170 S. W. (2d) 416.

Kansas City Court of Appeals.   April 5, 1943.

1062

*Thomas J. Cole, James A. Potter, Leon P. Embry* and *Marion R. Garstang* for appellant.

1064

1066

BLAND, J.—This is an action for damages, founded upon the failure of the defendant to stop, at plaintiff's destination, a train upon which she was a passenger, and for personal injuries suffered by her while upon said train. There was a judgment in favor of plaintiff in the sum of $2500, and defendant has appealed. Plaintiff has not favored us with a brief.

The facts show that plaintiff, a resident of Hermann, was 72 years of age at the time in question; that in the early part of January 1941, she was in St. Louis visiting her children; that late in the afternoon of January 5, 1941, in company with her son-in-law, plaintiff went to the Union Station in St. Louis for the purpose of returning to Hermann. The train, leaving St. Louis at 4:01 P. M., for which Hermann was a scheduled stop, had already departed. There was a later train leaving St. Louis at 5:45 P. M., for which Hermann was not a scheduled stop.

Plaintiff's son-in-law bought a ticket for her to Hermann but when she went to get aboard the 5:45 P. M. train she was informed, by the gate keeper, that it did not stop at Hermann; that she could not take passage thereon unless the "head man" approved it. The son-in-law set out to find the "head man", who returned with him and told the conductor to let plaintiff "off at Hermann". She boarded the train and thereafter the conductor took up her ticket. Later the porter came and told her: " 'Now, if I call Hermann, you just wait a few seconds, and then you get out on the platform. I will take your one basket along out.' So I did as he said."

Plaintiff testified that as the train neared Hermann, and, at a point which plaintiff judged to be about three miles therefrom, the porter called "Hermann"; that "I waited a few minutes. The door was closed, I hardly could open it, and I had all of my suitcases and other belongings. I had to carry just as much as I could hold. And I went out on the platform, and the porter was standing on the steps, and not saying one word to me. And I found my basket laying on

the side, ready to roll off of the platform. So I had to keep an eye on that and keep it from falling down. And I put my feet right hard on it, and braced myself against that closed door of the coach. . . . The door was closed, and the wind was blowing, and was so cold, my ear, I couldn't hear, and after I got off of the train I couldn't hear for six months.'' There was a light in the train. It was about dusk and was not light enough for plaitniff to see Hermann. She stood on the platform for eleven or twelve minutes, all of the time expecting the train to stop at Hermann. When the train finally stopped it was at the town of Gasconade about eight miles beyond Hermann.

Later, in her testimony, plaintiff stated that she had but one suitcase but that her arms were full of small packages, including her purse; that while she was on the platform the train was running at a high rate of speed and jerked and shook; that the wind was blowing and it was cold; that she became very nervous and excited; that she stood against the door and ''I didn't have no hold, I had to brace, and then I got them cramps so strong in my legs, I didn't know where to put them;'' that ''It was pretty cold, pretty cold, my hands they were just stiff, by holding things, and bracing back, and my head was knocked on the door, and oh, it was terrible, I was nearly out, and with all of the excitement, where I landed I don't remember;'' that ''it shook me around and jarred me,'' and when she had been on the platform for about ten minutes, ''all of a sudden I got such a pain in the lower region of the bowels, around the bladder and the womb, and I didn't know what it was, and I felt something sliding down. And nowadays that bladder is out as big as a fist all day long;'' that, ''Well, as I say, I was hurted all over, my arms, and I think that I got them cramps now. I overstrained my legs pushing that train floor down. I didn't want to get killed, that train was going fast, and in a wild way.''

Plaintiff alighted from the train at Gasconade. She remained there about forty minutes and was given free passage back to Hermann. She testified that she made no complaint of her injuries to anyone that day.

Plaintiff further testified that, during the time she was on the alighting platform of the train, the porter stood on the steps of the train with his head out, looking toward the rear; that he was four and one-half or five feet from her; that he said nothing to her and she said nothing to him; that so far as she knew he did not see her; that it appeared to her that he did not now that she was there. She testified afterwards that she was stiff and her bones hurt and ''I laid around for a whole week;'' that she was sometimes in bed and sometimes she sat up; that she was unable to do any of her housework during the following week; that she was never able to resume her work as she had done it before; that she had help from her sister, her neighbors and the neighbors' children, who ran errands for her;

that prior to her injury she kept house for herself and her son; that she did all of the housework, split wood, laid bricks and tended a garden. There was other testimony that she split all of the wood used in the house; that she would carry a bucket containing three gallons of water in each hand and would spade the garden.

Plaintiff testified: "I could do any work, hard work like a man, and now I am done;" that she did her washing before she was injured, but that, now, her sister did it for her; that in September, 1941, she suffered a hemorrhage from her womb; that about five minutes before this occurred she became excited about something a neighbor woman told her; that she had never before suffered any hemorrhage or discharge from her womb; that about twenty-three years prior to the occurrence giving rise to this suit, when she was fifty-one years of age, she was operated on and the ligaments holding her womb were sewn up; that after this operation the doctor told her "You are as perfect as a young one now;" that she was always a well woman; that she never had a "sinking bladder of any kind."

There was other testimony that plaintiff was a strong woman, doing most of the work, such as splitting wood, etc., up to the time of the train ride in question; that thereafter she was not seen to do any heavy work; that she spent most of her time sitting on her porch; that during the months of January and February her sister did most of her housework for her and the children in the neighborhood ran her errands.

When plaintiff suffered the hemorrhage from her womb in September, 1941, she consulted Dr. Workman, who testified that he treated and administered to her professionally; that on examining her he found her condition to be a chronic one of long standing and that she was suffering from cystocele; that this "is a condition where the vaginal wall gives way, and allows the bladder, due to pressure from the inside, pushing the uterus down on the bladder, and pushing the bladder out into the vagina;" that, in his opinion, her ride on the alighting platform or vestibule of the train aggravated her condition, and that her condition would get worse. The doctor concluded that the plaintiff needed surgical attention and caused her to enter a hospital in St. Louis, where she was operated on for womb trouble. The surgeon who performed the operation was not called as a witness.

It appears that plaintiff had given birth to a number of children and that one of them was a very large one, weighing about thirteen pounds. Dr. Workman testified that it could reasonably be expected that the birth of so large a child would result in damage to the mother's female organs. However, he testified that plaintiff told him that "she got through all right." The doctor further testified that strenuous work such as splitting wood, etc., would have a tendency to make plaintiff's condition worse, and that the hemorrhage which plaintiff suffered could have been caused by any unusual excitement.

The evidence on behalf of defendant was to the effect that plaintiff did not leave her seat or come to the alighting platform or vestibule of the train until the train had stopped at Gasconade, and that she was not told to go to the platform prior to that time; that there was no rough handling of the train nor unusual lurching thereof and that plaintiff showed no signs of injury and made no complaint of any injury.

The conductor, testifying for the defendant, stated that defendant's passenger agent in St. Louis brought plaintiff to the train and told the witness that "he would get a message for me at Washington to stop for her at Hermann;" that Hermann was not a scheduled stop for this train and his authority to stop it would have to come from the dispatcher in the form of a message. There is no direct evidence that any such message was received by the conductor, but he testified that, when the train approached Hermann either he or the porter, at his direction and in his presence, gave the signal to the engineer by pulling the bell cord for the train to stop at Hermann in order to permit plaintiff to alight at that place; that the engineer answered the signal by whistling but did not stop at Hermann; that after the train arrived in Jefferson City he inquired of the engineer why he did not obey his signal and the engineer replied that Hermann was not a stopping point for this train, whereas, Gasconade was a flag station; that the engineer "figured we were pulling too soon and wanted to stop at Gasconade."

It does not appear in the evidence, introduced on behalf of plaintiff, that there was any curve in the railroad between Hermann and Gasconade. Defendant's evidence tends to show that there were curves in the road but no "bad" or "dangerous" curves. There was no evidence on behalf of plaintiff tending to show the speed of the train, but defendant's evidence tends to show its speed was between fifty-five and sixty miles per hour between Hermann and Gasconade.

The petition alleges that plaintiff purchased from defendant's agent in St. Louis a ticket entitling her to passage from that point to Hermann; that she entered the train and when the train approached Hermann the agent of the defendant, in charge of the train, announced that it was nearing Hermann and commanded or ordered or caused plaintiff to get her baggage and go to the alighting platform or the vestibule; that plaintiff obeyed; that when the train arrived at Hermann defendant's agent in charge of the train "carelessly and negligently failed and neglected to stop said train for the purpose of allowing plaintiff to alight therefrom, but negligently and carelessly transported said plaintiff to Gasconade, Missouri, some eight or nine miles West of Hermann, Missouri;" that defendant's agents in charge of the train negligently and carelessly caused, permitted, forced and suffered plaintiff to stand on the vestibule and alighting platform while the train was running between Hermann and Gasconade, which vestibule

and alighting platform was cold, dark, without seats or rails, and that while on the platform plaintiff was subjected to excessive, extraordinary and unusual shaking, jarring and vibration; that defendant was guilty of carelessness and negligence in causing the train to give violent, unusual, extraordinary unexpected jerks, jars, lurches and shakings when the train was continuing at a rapid rate of speed while the plaintiff was stationed upon said platform.

The answer contains a plea of contributory negligence, in that, it alleges, that plaintiff unnecessarily remained and rode on the alighting platform and was careless in the position and manner that she rode on said platform.

Plaintiff's petition may be considered as having alleged three acts of negligence: (1) failure to stop the train at plaintiff's destination: (2) causing plaintiff to ride upon the alighting platform between Hermann and Gasconade under the conditions described in the petition: (3) negligence in injuring plaintiff while on the platform by defendant's agents causing the train to give violent and unusual jerks, etc.

There is no contention made on the part of the defendant that the petition was not sufficient to allege these three grounds of recovery. However, defendant contends that, as the train in question was a nonstop train as to Hermann, and plaintiff was advised of that fact, she is not entitled to recover for its failure to stop there, but her cause of action, if any, was for misdirection.

The mere fact that plaintiff was permitted to enter the train is not sufficient to base a cause of action on her part for the defendant's mere failure to stop the train at Hermann if Hermann was not a scheduled stopping point. As was said in Sira v. The Wabash Ry. Co., 115 Mo. 127, 133: "Safety and convenience of passengers, as well as the business interests of the carrier require 'the adoption and strict enforcement of reasonable regulations for the operation and management of trains. The public has the right to rely upon them.'" Unless plaintiff has shown that the conductor, under the rules of the defendant, was authorized to stop the train at Hermann, her only right to a recovery, under the first theory of recovery described in the petition, would be based upon misdirection and not upon failure to stop the train. [Sira v. The Wabash Ry. Co., supra; Marshall v. The St. Louis, K. C. & Northern Ry. Co., 78 Mo. 610.]

However, we think there is ample in the record to show that the conductor was directed to stop the train at Hermann so as to permit plaintiff to alight therefrom. He testified that the passenger agent told him that he would have a message for the witness at Washington directing him to stop the train at Hermann. While there is no direct testimony that any such message was received, there is an inference to be drawn from the evidence that it was received, as he undertook to stop the train at that point. The failure to stop at Hermann was a breach of defendant's common law public duty to stop the train at

plaintiff's destination. It is the public duty of a carrier to exercise the highest degree of care attainable by the most prudent person engaged as a common carrier of passengers for hire to carry a passenger to his destination and to stop the train so that he may alight thereat. Failure to exercise such care and failure to discharge such duty gives rise to a suit either on the contract of carriage or for tort founded on the contract and duty. In either case if no actual damage is shown, at least when the suit is upon contract, plaintiff is entitled to nominal damages (Rawlings v. Wabash Ry. Co., 97 Mo. App. 511, 513; Chattanooga, Rome & Columbus R. Co. v. Lyon (Ga.), 15 L. R. A. (N. S.) 857, 859; Adams v. The Mo. Pac. Ry. Co., 100 Mo. 555, 565, 566; Caldwell v. Richmond, 15 S. E. 678 (Ga.), unless the failure to stop was the result of some overruling necessity and the burden is upon the carrier to show this. [Ft. Smith & Western R. Co. v. Ford (Okla.), 41 L. R. A. (N. S.) 745; Owens v. Atlantic Coast Line R. Co. (N. C.), 61 S. E. 198; Chattanooga, Rome & Columbus R. Co., supra; 10 C. J., p. 847.]

Defendant attempts to explain why the train was not stopped at Hermann, but this explanation hardly measures up to the requirement of a overruling necessity. We conclude that plaintiff was entitled to go to the jury on the first allegation of negligence contained in her petition and, further, that she was entitled to go to the jury on the second allegation.

As to the second allegation, while defendant contends that the question as to whether plaintiff's womb condition was aggravated by her ride on the alighting platform of the train is left to more or less speculation and conjecture, and that plaintiff's testimony as to the injuries she received is contrary to human experiences and, therefore, lacking in probative force (a matter that will be discussed in connection with our comment on the instructions) yet, plaintiff's testimony, that by reason of the cold she caught cold in her ear, cannot be considered speculative, under the circumstances, or lacking in probative force, and in proving this injury, alone, plaintiff made out a case under her second allegation of negligence. There was no effort made to submit to the jury the third allegation of negligence.

However, defendant contends that plaintiff was guilty of contributory negligence, as a matter of law, in standing on the platform for so long a time under the circumstances detailed by her. There is no contention that plaintiff was guilty of contributory negligence relative to the first cause of action pleaded. But aside from this, we are of the opinion that she cannot be convicted of contributory negligence, as a matter of law, relative to the second cause of action pleaded. In this connection, defendant points out that, while plaintiff went to the alighting platform she did not talk to the porter, and defendant says that he did not know that she was on the platform; that she expressed the opinion that the porter did not know she was there; that although

she says she was on the platform about ten minutes before she suffered any pain and the porter was only four and one-half or five feet away, she said nothing whatever to him and she did not complain to him of any pain; that she made no effort to return to the coach. Plaintiff explained why she stood on the platform so long a time by stating that she did not know that the train had passed Hermann and she was expecting it to stop at that place at any time. In an answer to a question as to whether she had said anything to the porter about going back to the coach, she replied: ''I was waiting to get to the station''. She was asked: ''Q. Did you attempt to go back into the coach and sit down at any time? A. I was waiting to get off at Hermann, I didn't know where I was, whether I was past Hermann, or below Hermann or anything. I couldn't see anything''.

The porter had directed plaintiff to take her station on the alighting platform and he was standing on the step, a short distance from her, while she was there. It would be natural to conclude that he knew that she was there, under the circumstances. But defendant's point is not based so much upon the porter's knowledge or lack of knowledge as upon plaintiff's failure to say anything to him about the situation. Plaintiff could very well have concluded that the porter was on the step waiting for the train to stop. However, she fully explained why she remained on the platform under the circumstances. We are of the opinion that the court committed no error in refusing to give defendant's instruction in the nature of a demurrer to the evidence.

Numerous complaints are made of plaintiff's instructions. These instructions were six in number and cover ten pages of the printed record. Five of these instructions attempt to cover phases of the case and each of these five directs a verdict.

Plaintiff's Instruction No. One tells the jury that defendant's agents were under the duty to exercise the highest degree of care to avoid injury to passengers and to transport them safely to their destination. It then submits that the jury find whether plaintiff was a passenger on the train in question and when it neared Hermann, at the invitation of the defendant's agents, she took a position on the alighting platform with the intention of getting off at Hermann, and while thereon defendant's agents failed to stop the train at that place and continued on with the train to Gasconade, a town eight miles west of Hermann and, while on said platform, plaintiff, in the exercise of ordinary care, received injuries to her female organs or caused an aggravation of preexisting injuries thereto, etc., due to the swaying, lurching, etc., of the train, and by reason of the position plaintiff was required to take to steady and support herself on said platform; and that if the jury further found that, by reason of the cold wind blowing through and over said platform, plaintiff suffered an injury to her ear, and that, in consequence of such injuries, she

suffered pain and mental anguish, their verdict should be for plaintiff and that they should award her damages for such of said injuries that she received. The instruction does not require the jury to find that the acts of defendant submitted therein constituted negligence.

Plaintiff's Instruction No. Two is quite long. It reiterates the degree of care required of defendant. In it plaintiff appears to have attempted to submit the matter of liability for defendant's failure to stop the train at Hermann, and, in conjunction therewith, and a part thereof, appears an instruction on the measure of damages, permitting recovery for injuries received by plaintiff by reason of being on the platform of the train with the train jerking, lurching, etc,; but the instruction does not have the jury find that the injuries she received while on the alighting platform were the direct result, or were proximately caused by the failure of the train to stop.

Instruction No. Three is an abstract statement of the law relating to the highest degree of care that defendant was required to exercise under the circumstances.

Instruction No. Four again instructs the jury as to the high degree of care that it was defendant's duty to exercise under the circumstances, and submits the same facts, generally, as contained in plaintiff's Instruction No. One, except that the instruction seeks to base recovery solely on account of plaintiff catching cold. This instruction, as Instruction No. One, does require the jury to find the facts therein submitted constitute a failure to exercise the applicable degree of case therein mentioned, but assumes that the acts submitted therein constitute negligence.

Instruction No. Five is quite long. It appears to base recovery upon a mixture of failure to stop the train at Hermann, permitting plaintiff to stand on the platform between Hermann and Gasconade in cold and inclement weather, the fact that there were on hand rails on the platform, and that defendant's agents "caused, permitted, forced, or suffered plaintiff to stand and ride on said alighting platform" while the train was traveling from Hermann to Gasconade, and concludes by telling the jury that if it found that plaintiff suffered damages to her female organs by reason of the violent and unexpected jerks, etc., of the train, and that by reason of the wind blowing across the alighting platform, plaintiff suffered an injury to her right ear, their verdict would be for the plaintiff.

The instruction, like Instruction No. One and Four, does not require the jury to find that the acts of defendant submitted in the instruction constituted his failure to exercise the applicable degree of care.

Plaintiff's Instruction No. Six directed a verdict for the plaintiff merely upon the failure of defendant's agents to request or require plaintiff to go back into the coach, but suffered and permitted her

to stand on the vestibule holding her baggage between Hermann and Gasconade, as a result of which plaintiff received specified injuries.

Plaintiff's Instruction No. Seven reiterates the degree of care that defendant was required to exercise under the circumstancs. It directs a verdict upon defendant's acts relative to plaintiff's remaining on the alighting platform, which had no lights or hand-railings, and that by reason of such facts plaintiff was injured by the swaying, jerking and lurching of the cars in the train.

Plaintiff's Instructions One, Four, Five and Seven are erroneous in that they each fail to require the jury to find that the facts therein hypothesized constituted negligence on the part of the defendant. [McCullough v. St. Louis Public Service Co., 86 S. W. (2d) 334; McCollum v. Winnwood Amusement Co., 59 S. W. (2d) 693, 697, 698.]

Instruction No. Two was erroneous in that the jury was not required to find any causal connection between the negligence and the injuries therein submitted. We are not called upon to decide whether there is room for plaintiff to base a cause of action for the injuries she received on the alighting platform solely upon the fact that the train did not stop at Hermann.

Some of plaintiff's instructions ignore the defense of contributory negligence. [Alexander v. Hoenshell, 66 S. W. (2d) 164, 168.]

Instructions Nos. One, Two, Five, Six and Seven submitted the question of injury to plaintiff's womb or the aggravation of an already existing disease of the womb. In this connection defendant contends that in order for the jury to find any connection between plaintiff's riding on the alighting platform and the injury to her womb it was required to indulge in speculation and conjecture and that her testimony concerning the same is so contrary to human experiences as to be utterly lacking in probative force. In this connection defendant points out that plaintiff had borne six children, one of whom was abnormally large, because weighing thirteen pounds; that Dr. Workman testified that this would be expected to result in damage to plaintiff's female organs; that twenty-three years prior to plaintiff's train ride in question she had been operated on and the ligaments of her womb were sewn up; that she did not consult a doctor from the time of the train ride until the latter part of September; that when she did consult a doctor he found her condition to be a chronic one of long standing; that the doctor was of the opinion that the train ride had aggravated this condition but did not cause it; that the doctor testified that other forms of physical exertion, such as stooping or lifting, laying bricks, making garden and splitting wood would tend to aggravate this chronic condition; that the hemorrhage plaintiff complained of did not occur until practically nine months after the train ride, and immediately after a neighbor woman had excited her about something; that the doctor testified that the hemorrhage could have been caused by unusual excitement. Defendant also points out

that plaintiff made no complaint, on the day of her train ride, to any-body of pain or that she had received any injury.

While plaintiff had had an operation for womb trouble twenty-three years prior to the train ride, still, the evidence shows that the operation was a complete success and that she was not suffering any ill effect from the condition of her womb prior to the train ride; that she was able to do strenuous and unusual work for a woman without pain or trouble up to the time of the train ride, and there-after she was unable to perform her usual household duties for a month or two and following that she was unable to do the heavy work that she had done before.

Whatever may have been the immediate cause of her hemorrhage, the evidence fairly shows that the underlying cause was her womb trouble, and the evidence shows that this was at least aggravated by the ride on the platform of the train. She gave an explanation as to why she had not consulted a doctor between the time of the train ride and the month of September, when the hemorrhage occurred, by stat-ing that: "Of course, I am a person that don't run to the doctor right away, I always thought it would get better." As to why she made no complaint of any pain or injury to the railroad men on the day of the train ride, she stated that she did not want to complain to strange men, "that is not my style."

Dr. Workman did not testify that the strenuous exercise, such as stooping, lifting, laying brick, spading, etc., did aggravate plaintiff's condition but that it might tend to aggravate her condition. However, plaintiff's testimony is to the effect that it did not aggravate it. As to the birth of the abnormally large child, the evidence shows that plaintiff suffered no ill effects from this.

We think that all of the testimony, taken in its most favorable light to plaintiff, was sufficiently substantial for the consideration of the jury as to whether the ride on the platform of the train aggravated plaintiff's womb condition.

Defendant makes much of the point that plaintiff did not call, as a witness, the surgeon, who operated on her in St. Louis in the fall of 1941. She did call the physician whom she first consulted and her failure to call the surgeon was a matter going solely to the weight of the evidence.

We do not wish to be understood as approving plaintiff's instruc-tions in any particular for their use at another trial. There is no reason why plaintiff's instructions, in this case, should be so numerous as to cover ten pages of the printed record. It seems to have been the theory of plaintiff that it was proper for her to divide up the circum-stances of each of the alleged acts of negligence of the defendant and base a verdict on each circumstance and, also, to divide up the injuries and base a verdict upon each of those. In connection with the real

acts of negligence involved in this case the instructions, taken as a whole, could not have been very enlightening to the jury.

We find that defendant is correct in stating that, in the instructions, there are five or more references to the swaying and lurching of the train, five references to the duty resting on the defendant as a carrier, six or seven references to the cold weather, and six or seven references to the plaintiff carrying, or standing on the platform, holding her baggage. There was no occasion for such repetition of all of these things.

Complaint is made of the action of the court in permitting Dr. Workman to testify as to a statement made to him by plaintiff about the train ride, and in permitting him to base an opinion, in part, upon plaintiff's narrations to him in reference to the train ride. Defendant's contention in this regard must be sustained. While, a physician may testify as to statements made by his patient relative to his or her condition, at the time of the examination, the doctor's opinion, based upon a history of past events or circumstances as to how the injury occurred as related to him by the patient, should be excluded. [Mendenhall v. Springfield Traction Co., 26 S. W. (2d) 50, 52.]

There are other points made by the defendant but, as these involve matters that probably will not occur at another trial, it is unnecessary for us to pass upon them.

The judgment is reversed and the cause remanded. All concur.