Carl DAVIES, Plaintiff-Respondent,

v.

CARTER CARBURETOR, DIVISION ACF INDUSTRIES, INCORPORATED, Defendant-Appellant.

No. 52621.

Supreme Court of Missouri, Division No. 1.

July 8, 1968.

---

Gentry, Bryant & Sheppard, Arnot L. Sheppard, Herbert E. Bryant, St. Louis, for defendant-appellant.

John D. Connaghan, St. Louis, for respondent.

MARSHALL CRAIG, Special Judge.

■ This appeal is from judgment in the Circuit Court affirming an award of the Industrial Commission of this State in favor of the employee (claimant), Carl Davies. Appellant (employer) was ordered to pay claimant $7,350 for medical and hospital care and treatment; the sum of $42.50 per week for a total of 300 weeks and then $27.50 per week for the balance of his life, for permanent disability. The employer denies responsibility to claimant for injuries, if any, which he claims to have sustained. The facts pertinent to the issues are here set out and will be considered in the light most favorable to the prevailing party. Harper v. Home Imp. Co., et al., Mo.Sup., 235 S.W.2d 558. We must affirm the award if it is supported by competent and substantial evidence on the whole record. We cannot substitute our judgment on the evidence for that of the Commission.

On October 8, 1962, claimant was in the employ of the appellant. He had been so employed for about three years. At the time of the trial claimant was thirty-eight years of age. On the day in question, he reported for work at 3:30 P.M. His duties consisted of running an onsrud mill which was a revolving turntable on which parts of carburetors were placed to be moved through cutters of a circular machine. The parts were placed on the turntable at a point on the north arc of the machine, and passed counterclockwise to plaintiff's left. After they passed through the cutters, they were picked up by the claimant and placed on "flats." These were metal instruments about four inches above the ground and rested on metal runners. They were then transferred to "pans" which were metal instrumentalities about six inches to ten inches deep. They weighed about eleven pounds empty and from thirty-five to forty pounds when full of carburetor components, and were about three feet long. The sides of the pans were not vertical, but slanted out from the bottom to the tops. The sides near the tops were curled from the top down so as to make a lengthwise extrusion of metal to be used as a handle. They were of aluminum alloy. The material he was working with and handling were carburetor bodies, and twelve such bodies were loaded on each pan.

After the carburetor bodies had moved counterclockwise to the south side of the table, plaintiff picked up each carburetor body and placed it in a pan on the left side of the turntable. This type of maneuver was a regular routine and he did this in the same manner every day. He picked up the carburetor body on top of the pile then took the second one and worked down toward the bottom of the pan. As he worked toward the bottom of the pan, the employee customarily turned slightly to the right or left to get hold of these pans. His testimony on cross-examination as to these maneuvers was as follows:

"Q And when you did that, was it your custom to turn slightly to the right or the left to get hold of these pans?

"A Yes.

"Q You had to do that, didn't you?

"A Yes.

"Q No other way to do it, was there?

"A Not to my knowledge.

"Q That's the way you did it?

"A Yes.

"Q And then, as you reached lower down, did you, when you got to the second tier there, let's say number four from the bottom, you reached to the closest pan and worked your way over to the opposite end of the flat, didn't you?

"A Yes.

"Q Did you do that with each one of them?

"A I'm pretty sure.

"Q Each tier, I mean.

"A I'm pretty sure.

"Q You turned, reached over and got the end one? The one closest to you. You didn't reach over and get the one on the opposite end first, did you? You always picked up the one closest to you?

"A Yes.

"Q Began at the top, turned around to your right somewhat, turned back and laid it on your table?

"A Yes.

"Q All the time you did that; right along?

"A Yes.

"Q You worked it the same way on the day this occurred?

"A Right.

"Q Right?

"A Right.

"Q And you made the same character of movement and about the same steps every time. You had to didn't you?

"A Every time.

"Q You had to stop (stoop) lower as you got down into the lower tiers?

"A That's correct.

"Q That was true of every one of them, wasn't it—every flat?

"A Yes."

At the time of the occurrence from which he claims his injury, he was lifting the pan straight up. It was the last layer, the one closest to the floor. He thought he had lifted it, at that time, approximately a foot above the pan at which time he felt a pain and he set it back down and let go of it.

As to the exact occurrence at the time, the evidence was as follows:

"Q (Mr. Connaghan) You may describe what kind of position you were in.

"A I was turned to the right. My body was twisted. I bent over the flat, picked up the pan of parts and, as I came up, I went off balance with this pan of parts and I felt this pain in my back—this sharp pain; and I was standing with my left foot forward and my right foot back and, when this threw me off balance, my foot—my right foot come back and, as I say, this pain shot through my back. I straightened up and that pain diminished, but an ache formed, you know, a pain, and it gradually just got worse.

"THE REFEREE: Just a moment—had you finished your testimony?

"THE WITNESS: So far, yes.

"THE REFEREE: Your left foot was forward and your right foot was back and you were turned to the right and you bent to pick up this pan?

"THE WITNESS: Yes sir.

"THE REFEREE: You said that you went off balance and you also used the term 'when it threw me off balance', unquote, could you tell me a little more what you mean by that?

"THE WITNESS: The fact that I was twisted in lifting this pan of parts,—the position I was in was what threw me off balance.

"THE REFEREE: You may proceed, Mr. Connaghan.

"Q (Mr. Connaghan) Now, where was this pan that you were lifting at the time you just described there? Where was it located on this flat in regard to the flat?

"A It was on the far side of the flat from me.

"Q Was it the first pan that you lifted off the flat?

"A No.

\* \* \* \* \* \*

"Q In regard to which row, which stack was this particular pan in that you lifted?

"A It was at the bottom."

Immediately following the occurrence, the claimant, with the permission of the foreman, made two visits to the nurse and went home. The next day he was admitted to St. Anthony's Hospital and on October 17, 1962 he was operated on by Dr. Udaya N. Dash. The operation consisted of a laminectomy. On October 25, 1962, another and like operation was performed on the claimant. Following the second operation, plaintiff was treated for a bacterial growth known as pseudomonas aeruginosa. In this connection, he was treated by both systemic and local injections of solutions. After several days of treatment this infection was finally healed.

Claimant had additional trouble near the area of operation for the two laminectomies and was admitted to Alexian Bros. Hospital on November 29, 1962 where he remained until December 11, 1962, and was then again admitted to the same hospital on January 5, 1963.

Because of continuing trouble, he entered the Veteran's Hospital in St. Louis on January 31, 1963, going directly there from Alexian Bros. Hospital, and was released on June 5, 1963 and remained away until July 3, 1963. However, while he was in the Veteran's Hospital, Dr. Earl P. Holt, Jr. operated on his back on February 7, 1963. About a week later he again was operated on at Veteran's Hospital. Following the second operation at Veteran's Hospital, the wound was closed with a small drain, and he was in that condition for some time. Hearings were held on June 6, 7, 12 and 13, 1963, at which time claimant was ambulatory.

The claimant was referred by his family doctor to Dr. Udaya N. Dash, an orthopedic surgeon. Dr. Dash testified that he first saw claimant on the 10th day of October, 1962 and examined him at St. Anthony's Hospital. He was given a history of pain in the low back. The Doctor found tenderness in the low part of the back between the L-4, L-5 and S-1 region and in the sciatic notch and the right sciatic nerve. After a physical examination, examination of X-rays, and a myelographic study, claimant was placed in traction and when improvement was not shown, a laminectomy was done on October 17, 1962. The ligament of flavil was removed along with pieces of bone from the lamina of L-4 and L-5 of the right side exposing the dural sac and the nerve root. On exploration of the disc space it was found that there was a bulging disc underneath the nerve root of L-5, this was soft and incision was made into the posterior longitudinal ligament, and the disc material was removed piecemeal. It was found that the spinal fluid was leaking at one place from a rent in the dura. Three or four days following the operation, claimant started having some drainage from his wound and on October 25, 1962 a laminectomy was again performed. This operation was done by Dr. Burst. Following this second operation there was infection and further treatment required. The claimant was discharged from St. Anthony's Hospital on November 17, 1962. He was later admitted to Alexian Brothers Hospital where Dr. Dash saw him several times, the

last time being on January 4, 1963. In answer to a hypothetical question, the Doctor answered that "The injury could have caused it; the injury caused the ruptured disc."

"Q Doctor, you say the injury caused the disc? Could you be more specific with what you mean by the injury?

"A While Mr. Davies was lifting this heavy object, he injured his back and the part of the back that was injured was the disc."

Dr. Earl P. Holt, Jr., an orthopedic surgeon, who testified for claimant, first saw him about the first day of February, 1963, at John Cochran Hospital in St. Louis. He testified that the claimant's back was rigid and the patient would not or could not allow any flexion or extension of the back and that there was pain on motion in any direction. It was obvious that he had had prior back operations. Examination of the patient and of X-rays showed evidence of destruction in the second and third lumbar disc interspace with narrowing and apparent ankylosis in the fourth interspace and also it was indicated that a laminectomy had been done on the right side at the fourth space. He had some weakness and inability to dorsi-flex and plantar-flex his right foot. On February 7, 1963, Dr. Holt operated on claimant and discovered a purulent infection in the L-2, L-3 disc interspace. The material from that space was removed, and left open to drain. The Doctor was unable to gain access to L-3—L-4 interspace because of a bone bridge which covered the space. He found a heavy growth of proteus vulgaris organism, which is an infectious agent of fairly low grade. His opinion was that this infection resulted either from the blood stream or was introduced during the course of prior operations. Following this operation, another operation was performed about a week later by Dr. Holt and bone grafts were packed into the space of the disc between L-2 and L-3. The wound was closed with a small drain; cast applied and then a brace.

In answer to the hypothetical question the Doctor stated that, " * * * it would be my opinion that the lifting injury did cause the disc prolapse that was found at operation." On cross-examination the Doctor was asked if it would make any difference in his opinion if he had been informed that claimant had a pain in his back on the right side in 1961. In answer, the Doctor stated, "It would." He further stated "It would change my opinion considerably insofar as whether that exact episode caused the subsequent finding, yes."

At the hearing before the Industrial Commission on September 15, 1965, Dr. Robert Mueller was called as a witness for claimant and testified that he first examined him on August 6, 1965. He complained of a drop in his right foot and he was wearing a brace on his foot and a corset-type back support. The Doctor found that there was a rightward curvature of the spine just above the lower thoracic area and just above the operative scar area; there was definite ankylosis of the lumbar spine; lateral motions were markedly impaired, as was straight leg raising. Claimant complained of shooting pains throughout the back area. The Doctor found definite atrophy of the muscles of the left-lower extremity and of the tibialis anticus muscle. The doctor had access to previous reports. He testified that " * * * In the opinion of this examiner this man is permanently and totally disabled relative to work as a mechanic or any other moderate—or labor type of work. Long standing would also be a problem for him. The only type of work he could probably do would be that of clerical work or the very lightest type of work, and continued standing for long periods of time or sitting for long periods of time would undoubtedly cause considerable difficulty and symptomatology."

Dr. William A. Stephens, an orthopedic surgeon, also testified before the Commission on behalf of the claimant. He was given the history and complaints by claimant; reviewed some records, made some

X-rays; and examined him on April 14, 1964. After many hypothetical questions, he gave as his conclusion, "Well, I was of the opinion that, based on the history and physical examination, that this man was permanently and totally disabled due to his present back condition. * * * Well, my opinion, it's going to become progressively worse as time goes on." On cross-examination, the Doctor said he might do some minor work and that a company would have to make a special place for him and if he was given a job it would have to be some light job especially designed for him.

As to his disability, the claimant testified before the Commission, on September 15, 1965, that any activity placed him in pain; that he could not go any length of time without his back and leg brace; and that he had not been employed.

Dr. Edward Charles Holscher, an orthopedic surgeon, testified by deposition, on behalf of the employer. He first examined claimant on May 12, 1964 and again on August 17, 1965. He found weakness in the lifting power of the muscles that raise the foot and toes upward; he found the scars from prior operations and that his back motion was somewhat limited. The doctor gave, as his opinion, at the time of his first examination, that claimant was not able to resume his work at that time but that in the near future he could. At the time of the second examination the doctor gave as his opinion that claimant was not permanently and totally disabled. He testified that his physical activities will be limited, but that passage of time would strengthen his body, and he thought that a good fused back will withstand the rigors of hard work. He rated claimant as having a permanent partial disability of 35 to 40 percent of the man and 30 to 35 percent of the right ankle.

The principal contention of the employer is that claimant did not make out a case of "accident" as defined by the Statute and that the event was not "unexpected and unforeseen" or "violent." Section 287.020 (2), V.A.M.S. states:

"The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury."

The evidence in this case discloses that the claimant was in a twisted position, lost his balance and was immediately stricken with pain. The loss of balance has been considered compensable by the courts. In the case of Palmer v. Knapp-Monarch Co., Mo.App., 247 S.W.2d 341, the employee testified in conflicting statements as to the loss of her balance, although finding against her for the reason that neither the referee nor the Commission accepted her version of the facts, the Court recognized loss of balance, if established, as compensable. See also Hinderliter v. Wilson Bros., Mo.App., 412 S.W.2d 558, where the Commission found that there was no slip, no fall, "nor was he thrown off balance while lifting garbage", the Court upheld the findings of the Commission. In the case of Crow v. Missouri Implement Tractor Co., Mo.Sup., 307 S.W.2d 401, recovery was permitted where injury was the result of an unusual or abnormal strain, and was compensable as an "accident" under the provisions of Section 287.020, subsection 2, RSMo., even though not received or accompanied by a fall. The Court stated:

"* * * [W]here an employee's injury is the result of an unusual or abnormal strain arising out of and in the course of his employment, the injury is compensable. An abnormal strain may, therefore, be classified as an accident even though not preceded or accompanied by a slip or a fall. The following cases holding to the contrary are hereby overruled: Kendrick v. Sheffield Steel Corporation, Mo.App., 166 S.W. 2d 590; Howard v. St. Louis Independent Packing Co., Mo.App., 260 S.W.2d 844; Palmer v. Knapp-Monarch Co., Mo.App. 247 S.W.2d 341, and the opinion in the present case by the Springfield Court of

Appeals, Crow v. Missouri Implement Tractor Company, 301 S.W.2d 423."

The Commission, in its findings in the instant case, quoted from the case of Brotherton v. International Shoe Co., Mo. App., 360 S.W.2d 108. The Court there held (1.c. 114):

"We now conclude that the *unexpected and abnormal strain* is the important event. This will *usually* result from the doing of the work in an 'abnormal manner' or in doing work which is not routine, but it is not necessarily so. Witness the Howard case, supra, now overruled. And of course the *abnormal and excessive strain* must be such as of and in itself produced the injury. This rules out those injuries which result from the normal stresses and strains of work which are the product of routine stresses combined with inherent weakness or bodily defect, chronic disability, or natural causes. Smith v. General Motors Corp., Mo., 189 S.W.2d 259; DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834; see Smith v. Cascade Laundry Co., Mo.App., 335 S.W.2d 501. There was no evidence of inherent weakness or chronic condition (prior to the injury) in this case, and we therefore conclude that the claim came within what we conceive to be the doctrine of the Crow case."

In the case of Merriman v. Ben Gutman Truck Service, Inc., Mo.Sup., 392 S.W.2d 292, the Court sustained the Circuit Court in its judgment reversing the final award of the Commission. Recovery by the claimant had been denied by the Commission. There the claimant was engaged in lifting a heavy coil of rope while in an awkward, unusual and extended position. He experienced a sharp, burning pain in his back. The Court, citing the Crow case, supra, found that there was an abnormal strain and the injury resulted; that " 'The unexpectedness lies in the fact that force produces more strain than the employee has contemplated. This is true even though the force which caused the abnormal strain comes entirely from the physical exertion rather than from sources external to the body.' * * * [that he] was required to assume an extended position with his body which placed him completely out of a normal, usual or routine lifting position, * * *. The strain was thus abnormal; was unexpected in that it was more strain than claimant anticipated he would exert, and hence was an accident within the meaning of Section 287.020(2), supra." See also Williams v. Anderson Air Activities, Mo. App., 319 S.W.2d 61.

The case of Luketich v. Krey Packing Co, Mo.App., 413 S.W.2d 29, was a case in which the employee, in the usual line of duty, took hind quarters of beef off an overhead conveyor rail. He thus had the beef on his shoulder and he would turn and drop it on a nearby table. Someone left a waste car in his path in such position that the handle blocked his action. Unaware that the situation existed, the claimant turned toward the table, saw that his foot was going to strike the handle, instinctively stopped his motion, and in so doing the heavy beef put a great strain on him, causing him injury. The Commission awarded the claimant compensation. The employer contended claimant did not carry the burden of showing (1) that he had a disability resulting from the accident and (2) that the incident in question was such an abnormal or excessive strain as to entitle him to compensation under the law. The judgment was affirmed and the court referred to the Brotherton v. International Shoe Co. case, supra, in stating "The position of the waste cart caused the employee to do this work in an abnormal manner and thus an abnormal stress was placed on his back." It was the unexpected and abnormal strain caused by an unexpected event in doing routine work that set the stage for recovery. Also, see Sita v. Falstaff Brewing Corporation, Mo.App., 425 S.W.2d 487, where the Court upheld findings by the Commission that claimant sustained an unexpected and unusual strain constituting an accident while attempting to lift five cases of beer onto a platform which was three

feet higher than the hand truck. The claimant had a sudden pain—like an electric shock. The Court concluded that there was substantial evidence to support the Industrial Commission's finding that the claimant " 'sustained an unexpected and unusual strain constituting an accident.' "

■ We hold, in this case, that being thrown off balance resulted in more strain being placed on claimant than he anticipated he would exert. When the loss of balance causes added strain and is unexpected and unforeseen, resulting in injury, it is compensable. The Commission so found in this case and we agree that there was competent and substantial evidence to support that finding.

The employer relies on the case of Closser v. Fleming Company, Mo.App., 387 S.W.2d 194. There the Commission made a finding that claimant " 'did not sustain an injury by accident arising out of and in the course of his employment.' " His complaint was that he injured his back while unloading bags of sugar; that in so doing he was required to twist his back; that pain occurred as he was pushing the bags of sugar down the roller with his left hand after the conveyor had suddenly stopped; and that he exerted no more strength just before the pain hit him than on other occasions. There was no finding of any unusual event such as slipping, loss of balance or added exertion. The Court held that the Commission had found that at the time complained of, claimant was not exerting any more force or pushing in any different manner than on other occasions, and "The strain cannot be said to have been abnormal or unexpected, only the result, the injury, can be said to have been unexpected. We believe that all of these conclusions are supported by the evidence * * *." This case differs from the case at bar in that here, claimant lost his balance, and even though the method used by him was routine, it was not routine and usual to lose his balance. It was unusual and unexpected.

The employer also cites the case of Errante v. Fisher Body Division, General Motors Corporation, Mo.App., 374 S.W.2d 521. There the Commission, as in the Closser case, found that no event had occurred which constituted an accident. The claimant had stated that while going up some steps to the working area he heard a loud noise (hollering) and turned around all at once. The Court stated that "An injury in and of itself is not an accident within the meaning of the Workmen's Compensation law. * * * The evidence fully supports the finding that the claimant simply turned around to see who was hollering behind him, and this was voluntary and not accidental." The Court supported the finding of the Commission. The same is true of the case of Ginter v. Freund Baking Company, Mo.App., 388 S.W.2d 505, cited by the employer, where the Court upheld the finding of the Commission.

The employer also cited the cases of Coleman v. Hercules Powder Co., Mo.App., 284 S.W.2d 32, and Tines v. Brown Shoe Company, Mo.App., 290 S.W.2d 200 to support his contention that there was no occurrence that happened "violently." In each of these cases the Industrial Commission found in favor of the employer, and the Courts refused to overrule those findings for the reason, as stated in the Coleman case, "Under the law, the award of the Commission (absent of fraud) is conclusive on appeal if supported by substantial evidence." In each of those cases, the Courts found that the awards were supported by competent and substantial evidence. The employer also cites the case of Howard v. St. Louis Independent Packing Company, et al., Mo.App., 260 S.W.2d 844. However, that case is no authority in the instant case as it was specifically overruled by the Crow case. Also cited is Baker v. Krey Packing Company, Mo.App., 398 S.W.2d 185, where the evidence most favorable to claimant failed to show his strain was unexpected or unusual.

■ There was competent and substantial evidence that the event from which the

claimant claimed injury was unexpected and unforeseen. The Commission so found and we affirm that finding. Claimant testified that he was turned to the right; "My body was twisted. I bent over the flat, picked up the pan of parts and, as I came up, I went off balance with this pan of parts and I felt this pain in my back—this sharp pain; and I was standing with my left foot forward and my right foot back and, when this threw me off balance * * *." We think this is competent and substantial evidence. We follow the rule in the case of Gennari v. Norwood Hills Corporation, Mo.Sup., 322 S.W.2d 718, 724, where this court stated that we are limited to whether the findings of the Industrial Commission are supported by competent and substantial evidence upon the whole record and we are not at liberty to substitute our judgment for that of the Commission "unless the findings are clearly contrary to the overwhelming weight of the evidence."

The Commission found that the accident was the competent producing cause of the injury to the claimant and the after effects sustained by him. The facts as heretofore set out in connection with the occurrence and the events that took place immediately thereafter were in such sequence and rapidity that there was ample proof of causation. Two orthopedists testified that an accident such as was sustained by claimant could be a competent producing cause of the injuries he received. The evidence discloses that the chain of causation was not broken. Upon the claimant losing his balance, he felt immediate pain, went to the nurse and asked for a doctor. When a doctor was not available he went home, applied heat and the following day entered St. Anthony's Hospital. From that point on and without any intervening acts, there followed a series of operations and treatment. In the case of Sita v. Falstaff Brewing Corporation, supra, the Court stated: "He is still unable to work. The sudden onset of this pain and disability, and its continuous persistence, was sub-stantial evidence of causation even without expert medical opinion of causation." The testimony of the claimant alone would prove causation. In the case of Smith v. Terminal Transfer Co., Mo.App., 372 S.W.2d 659, the Court stated:

"In determining questions of fact the Industrial Commission has the right and the duty to draw such reasonable inferences as are warranted by the evidence taken as a whole and the circumstances disclosed by it. *The findings and conclusions of the Commission based on such inferences are binding upon reviewing courts.* O'Neil v. Fred Evens Motor Sales Co., Mo.App., 160 S.W.2d 775.

"The Commission is authorized to base *its findings and award solely on the testimony of a claimant.* His testimony alone, if believed, constitutes substantial evidence to establish that he sustained an injury arising by accident, Powers v. Universal Atlas Cement Co., Mo.App., 261 S.W.2d 512, and, as stated by this court in Tuller v. Railway Express Agency, Inc., Mo.App., 235 S.W.2d 404, constitutes 'substantial evidence of the nature, cause and extent of his disability.' "

The employer takes the position that the doctors who testified for claimant based their testimony on history given to them and when asked if they had known of previous pain or back injury, if their opinion would have been different as to causation, to which they replied that it would have made a difference in their conclusion. However, there was no proof in the record to the extent of a previous injury, if any, and there was no proof as to its possible effect upon claimant.

The employer relies on the cases of Holmes v. Terminal Railroad Association of St. Louis, 363 Mo. 1178, 257 S.W.2d 922 and Schears v. Mo. Pac. Railroad Co., Mo. Sup., 355 S.W.2d 314, however, in both of those cases the court was confronted with direct testimony of the doctor rather than hypothetical questions as in the instant case. As was pointed out in the Schears case,

the expert witness should be given competent evidence of proper facts and the proper source of the basis for a hypothetical question along with relevant matter.

The employer contends that claimant failed to show that there were objective symptoms of injury at the time of the event. In the case of Smith v. American Car & Foundry, Mo.App., 368 S.W.2d 515, 518, the court stated:

"The employer then contends that this record fails to prove that there were any objective symptoms of an injury produced at the time. Of course, 'at the time' is a phrase that must be given a reasonable constitution and, as used in the Compensation Act, this phrase does not mean that the event need reach its consummation immediately, but does mean as soon as the effects of the happening were manifest without any independent intervening cause being shown to be responsible for the condition. Schroeder v. Western Union Telegraph Co., Mo.App., 129 S.W.2d 917. Dr. Stephens testified that 'A spasm is an involuntary contraction of muscle' and that it is an objective finding."

In the case of Smith v. Terminal Transfer Company, supra, the court went into the contention as to causal connection between the injury and the alleged accident. The court held:

"The essential elements of a workmen's compensation case are required to be proven in the same manner as essential elements are established in the ordinary action at law. A compensation claimant is not required to make stronger proof than would be required to establish liability under the common law. 100 C.J.S. Workmen's Compensation § 547(1), p. 577; Schaefer v. St. Louis Independent Packing Co., 225 Mo. App. 506, 38 S.W.2d 303. In workmen's compensation proceedings the claimant's burden of proof to establish that the injury resulted from an accident is no greater than his burden to establish any other essential element of his claim. While it is not sufficient to show that there is a 'possibility' the injury was the result of the accident, the claimant's burden of proof of causal relation is satisfied by showing *with reasonable probability* that his injuries resulted from the accident to which he attributes them. See McCoy v. Simpson, 346 Mo. 72, 139 S.W.2d 950. 'The finding of the Commission need be based upon only a reasonable probability.' Greer v. Missouri State Highway Department, Mo.App., 362 S.W.2d 773, citing Karch v. Empire Dist. Elect. Co., 358 Mo. 1062, 218 S.W.2d 765; Lunsford v. St. John's Hospital, Mo.App., 107 S.W.2d 163, 166; Gardner v. Ford Motor Co., Mo.App., 130 S.W.2d 201(6); Leonard v. Fisher Body Co., St. Louis Division of General Motors Corporation, Mo.App., 137 S.W.2d 604, 610.

" 'In compensation cases, as in other cases, to sustain the finding of an ultimate fact, it is not required that such fact be shown by direct and positive evidence, but it may be shown by circumstantial evidence. It is not essential that all doubt be removed. It is only essential that the finding be based upon a reasonable probability.' Zimmerman v. Goodfellow Lumber Co., Mo.App., 56 S.W.2d 608; Shrock v. Wolfe Auto Sales, Inc., Mo.Sup., 358 S.W.2d 812; Dunaway v. J. C. Penney Co., 240 Mo.App. 61, 209 S.W.2d 567."

In the instant case, claimant, after the event complained of, was treated by the nurse immediately; tried to go back to work; tried to lift a pan, could not, returned to the nurse; was permitted to go home when a doctor was not made available to him; entered St. Anthony's Hospital the next day; was referred by his family doctor to Dr. Dash; was put in traction; myelogram was performed following X-rays with a negative finding; and a laminectomy was performed during which it was found that there was a bulging disc underneath the nerve root of L-5. All of this within nine days of the event and without any independent intervening cause.

The operations and medical attention that followed are heretofore set out, all without showing of independent intervening cause. The complete evidence, substantial in nature, supports the award. We do not find the case of Bussmann Mfg. Co. v. Industrial Commission, Mo.App., 335 S.W. 2d 456, cited by employer, to be in any way controlling in this case. That case arose under the Employment Security Law. The Commission had before it the long history of events. In the instant case there is no evidence of events other than the one on October 8, 1962 to which resulting damage might have occurred. Mention was made of some prior possible back trouble, without specific showing as to its nature and extent or resulting damage, if any. The doctors stated that such information might influence their conclusions, but no facts were given them to help them form an opinion on that. Dr. Dash stated that claimant had made known to him the fact that there had been some prior back trouble. Yet, no facts were given to any doctor as to treatment or injury prior to the event in question. There was no showing that any prior event caused or contributed to the condition of the claimant. In answer to the hypothetical question, Dr. Dash stated that the injury could have caused it, "the injury caused the ruptured disc."

■ While we agree with the employer that the burden is on the claimant to prove the injury at the time and objective symptoms, we cannot agree with the employer's contention that there was no such proof. A myelogram gave some evidence to the doctor as to injury and the finding of a bulging disc when an operation was performed added to the objective findings.

In the case of Albert v. Krey Packing Company, Mo.App., 195 S.W.2d 890, the Commission found for the employee and the employer argued that there were no objective symptoms. The court held (l.c. 893):

"Objective symptoms of injury, within the meaning of the act, are not limited to external wounds, bruises, and the like which can be seen or ascertained by touch, but include as well all involuntary expression of pain or distress, such as weakness, faintness, pallor or sickness, indicating a deleterious change in the body condition. * * * Moreover, it satisfies the requirement that the symptoms be produced 'at the time' of the event if they manifest themselves according to the natural course of such matters without any independent intervening cause being shown to be responsible for their appearance. Schroeder v. Western Union Telegraph Co., Mo.App., 129 S.W.2d 917."

■ The employer complains that the referee erroneously admitted, and refused to strike, inadmissible and incompetent evidence consisting of statements of what the claimant had related to the various doctors who had treated him. He complained that the referee announced that his ruling on the admissibility of testimony as to what claimant related as to the history would be admitted if in the judgment of the witness the statements were necessary to enable him to make a diagnosis. He also complains that the referee permitted Dr. Holt to express his opinion of cause and effect even though it was based partly on the history given to him and was, therefore, hearsay and had no probative value. The cases of Holmes v. Terminal Railroad Association of St. Louis, 363 Mo. 1178, 257 S.W.2d 922, 926; Schears v. Missouri Pacific Railroad Company, Mo.Sup., 355 S.W.2d 314, 317; Garrison v. Campbell "66" Express, Inc., Mo.App., 297 S.W.2d 22, 28; and Goetz v. J. D. Carson Company, 357 Mo. 125, 206 S.W.2d 530, 533, are cited. In each of these cases, the courts held that the doctor may testify to the complaints made by the person at the time of the examination and as to what the doctor's examination revealed. The Holmes

case, supra, best states the prevailing rule when it is there stated:

"A physician, in stating his expert opinion on a patient's condition, may testify to what he personally observed and also to what the patient said (an exception to the hearsay rule) concerning his present, existing symptoms and complaints. However, he may not base his opinion upon or testify to statements of the patient with respect to past physical conditions, circumstances surrounding the injury, or the manner in which the injury was received. Evans v. Missouri Pac. R. Co., 342 Mo. 420, 116 S.W.2d 8, 11(6); Corbett v. Terminal R. Ass'n., 336 Mo. 972, 82 S.W.2d 97, 102 (7–10); Nagel v. Thompson, 237 Mo.App. 1061, 170 S.W.2d 416, 423(10–11); Zarisky v. Kansas City Public Service Co., 239 Mo.App. 396, 186 S.W.2d 854, 856(3); Phares v. Century Electric Co., Mo.App., 131 S.W.2d 879, 883(4)."

■ The remark by the referee that the doctor might testify to whatever history he felt was necessary to enable him to make a diagnosis was not a very judicious statement. However, the testimony which he thereafter admitted in evidence, along with all the findings of the doctors was not in violation of the rules of evidence. The value of the testimony of the doctors in the instant case comes from the fact that they made actual findings of the conditions at the time and their opinions were based on hypothetical questions. In the Holmes and Schears cases, supra, the doctors had testified as to what the patient had told them as pure history of the case and not from hypothetical questions. As was stated in the Schears case, 355 S.W.2d 1.c. 320:

"As a general rule an expert witness will be permitted to state the reasons, if otherwise competent, upon which his opinion is premised. But when those reasons are based in part on hearsay, as far as the witness is concerned, the accepted and proper way to present in evidence an opinion of an expert witness is to present competent evidence of those facts from some proper source, and then submit them to the expert witness in a hypothetical question along with other relevant matter."

■ As stated by the employer, the burden is on the employee to prove cause and effect between the event relied on by him and the damage to him. He cites the case of Groce v. Pyle, Mo.App., 315 S.W. 2d 482 on that point. The court there held that it was not sufficient for recovery to show only that the injury complained of resulted from one or the other of two causes, and then stated (1.c. 490): "The resultant question of casual relationship was one of fact peculiarly for the determination of the Industrial· Commission. Cf. Vollmar v. Board of Jewish Education, Mo.Sup., 287 S.W.2d 868, 872; Garrison v. Campbell "66" Express, Inc., Mo.App., 297 S.W.2d 22, 30; Brown v. Griesedieck Western Brewing Co., Mo.App., 250 S.W.2d 803, 809."

There was no substantial evidence of two separate incidents causing injury in connection with the instant case. The mere mention of some prior back trouble is of no probative value here. The entries that were admitted were as follows: (Relating to employee's prior back trouble)

9–5–61—4:30 P.M.—Complaining of pain in lower right side of back. Stated it snapped as he bent over pulling dolly. Regular work.

9–5–61—11:20 P.M.—Zoalite reapplied to back. Feels better.

The facts thus recited were not put in a hypothetical question to any of the doctors. Thus they serve no value as medical evidence. Doctor Dash in answer to hypothetical questions gave as his opinion that that "the injury caused the disc", and Doctor Holt in response to the same type of question stated, "Assuming these things you have told me, it would be my opinion

that the lifting injury did cause the disc prolapse that was found at operation." The employer contends that Dr. Stephens presented another potential cause of injury and that the rule set out in Duff v. St. Louis Mining and Milling Company, 363 Mo. 944, 255 S.W.2d 792, would apply. In that case the court held that where death resulted from one of two causes, the evidence was not sufficient to show that death did in fact result from the cause covered by the act. That case does not apply here. There was no such conflicting evidence in this case.

The employer contends that the Commission erred in not giving greater weight to the suggested inconsistent statements of the claimant. George Hannibal, a fellow employee of claimant, and Robert C. Dodson, an attorney, testified that on October 11, 1962, they took a statement from claimant while he was in St. Anthony's Hospital. They contend that the claimant stated that at the time of the incident he "gradually felt a pain in his back"; that he did not slip; that he did not fall; that the nurse had given him a couple of pills and he had tried to go back to work, but could not; and that sometime in 1960 he had some trouble with his back. What was said at that time was written down by Mr. Hannibal, but claimant refused to sign it. There was nothing in the statement as to loss of balance. The facts that were set out were consistent with the testimony of claimant, except as to whether the pain came on gradually or all at once. At the hearing the claimant testified that the pain shot through his back and when he straightened up the pain diminished, but an ache formed and gradually got worse. In the case of Sita v. Falstaff Brewing Corporation, Mo.App.., 425 S.W.2d 487, the court reviewed the evidence and stated that there had been conflicting evidence by the claimant as well as by other witnesses. The appellants there contended that conflicting and contradictory testimony was self-destructive, and hence no substantial evidence left to support a finding of abnormal strain. The Court held that the contradictions in

Sita's testimony could affect his creditability, and "That, however, is considered only by the Industrial Commission, not by this court", and "We conclude, therefore, that there was substantial evidence to support the Industrial Commission's finding that the claimant 'sustained an unexpected and unusual strain constituting an accident.'" We find in this case that there was substantial evidence to support the finding of the Commission and that it properly disposed of the issue as to inconsistent and contradictory statements, if any.

The employer takes the position that the claimant is not entitled to recover, and is estopped from proceeding under the Compensation Act, because in the beginning he received payment under a Health and Accident policy. The case of Dubail, et al., v. Medical West Building Corp., Mo.Sup., 372 S.W.2d 128, is cited as authority for that contention. We do not find that case in point. First of all, there is the Statute, Section 287.270, V.A.M.S., which provides:

"No savings or insurance of the injured employee, nor any benefits derived from any other source than the employer or the employer's insurer for liability under this chapter, shall be considered in determining the compensation due hereunder."

The case of Griffin v. Doss, Mo.App., 411 S.W.2d 649, and cases there cited hold that the Compensation Law is wholly substitutional in character and cannot be altered by election, waiver, estoppel or contract. There was no proof of compliance with other provisions of the Act, i. e., Section 287.390, requiring approval by the referee or the Commission. Employer's position that claimant is estopped from asserting his rights to compensation under the Act on the ground that he accepted benefits from some other source is not well taken.

At the hearing before the referee, the medical bills in the amount of $6,438.29

went in without objection. At the hearing before the Commission, Dr. Stephens was permitted to testify as to the reasonableness of medical and hospital bills which amounted to $912.22 more than that shown before the referee. To this the employer objects because the qualification of the. doctor to so testify was not shown. Further objection is made because the Commission took over the examination of the witness and informed him what to say. The questions by the Commission were not objectionable and the testimony was proper. There was substantial evidence and testimony supporting the Commission's finding and award. See Harris v. Pine Cleaners, Inc., Mo.App., 274 S.W.2d 328.

■ The employer contends that both the Referee and the Chairman of the Commission were prejudiced against it; that it did not get a fair trial at the hands of the Referee or the Commissioner; that they did not act in accordance with the evidence (which we take to mean that their decision was against the weight of the evidence); that in weighing the testimony two of its witnesses, Hannibal and Dodson, the referee stated that their testimony "was given in a straightforward and convincing manner", and yet found against that testimony; that the decision rendered by the referee was clearly shocking and based on personal feeling. We find that this criticism was not justified. The Referee and Commission sitting as judges should not become advocates, however, they do have some discretion and responsibility in conducting a hearing. The employer in its brief cites jury cases in support of the position that the Judge should afford a just hearing and should be unbiased. The only civil case that is relied upon is Fleetwood v. Milwaukee Mechanics Insurance Co., Mo.App., 220 S.W.2d 614. In that case the Judge took over the case and conducted a long examination. The court held that the trial judge had made up his mind that the plaintiff should recover and made that opinoin clear to the jury. He also indicated how he felt about the defense and expressed doubt concerning the good faith of the attorney for the defendant. There was an obvious effort on the part of the Judge to influence the jury. The other cases cited were State v. Drew, Mo. Sup., 213 S.W. 106, State v. James, Mo. Sup., 321 S.W.2d 698, and State v. Smith, Mo.Sup., 422 S.W.2d 50, all of which were criminal cases. In the James case, the Court held that a Judge might put questions to a witness but that such practice "should be exercised with greater cautior" than he might exercise in a civil case or in any case tried without a jury. The Court felt that he had become the prosecutor, and in the Drew case, the Judge made improper remarks and expressed an opinion in the presence of the jury. In the Smith case the Court found that the Judge "assumed the role of a partisan, confused the functions of prosecution and judgment, and violated the principles which governed the conduct of trial judges in criminal cases, as laid down in State v. James, Mo.Sup., 321 S.W.2d 698." Neither the Referee nor the Commission in the case at bar took over the role of advocate, and asked only a few questions, none of which were prejudicial to the litigants. Neither the Referee nor the Commissioner violated the principles concerning the proper conduct of hearings.

■ The last serious contention of the employer is that the evidence failed to establish that the plaintiff is physically unfit to perform any kind of manual labor and will be so the remainder of his life. The evidence has heretofore been reviewed sufficiently to determine that there was substantial evidence as to the claimant being totally and permanently disabled. When testifying before the Commission (nearly three years after the incident) the employee related, "Well, any activity places me in pain and I can't go for any length of time without my back brace or my leg brace and I can't lift or stand for any length of time or walk for any distance without help of these braces." Dr. Mueller examined him almost three years after the accident and

testified as to the many operations on his back, resulting infection followed by ankylosis of the lumbar spine; and atrophy of the leg with foot drop on the right side. In his opinion the claimant was totally and permanently disabled relative to work as a mechanic or any other moderate or labor type work. Dr. Stephens, whose examination was about sixteen months before that of Dr. Mueller, found that he had a moderate trunk lift to the right with a flattening of the lumbar curve; that his motion was moderately limited with very little motion in the lumbar segment; that he bent forward through an arc of about 45 degrees; that his fingers would come within twenty inches of the floor with the knees extended and could extend his back to about a neutral position; that lateral bending was restricted; that there was a three-quarter inch difference in the length of the lower extremities; that X-rays showed the disc space between D-12 and L-1 to be obliterated and the space L-1, L-2 was markedly narrowed and the adjacent plates of the vertebra was somewhat blurred; and that there was obliteration of the disc spaces between L-2, L-3, L-4 and L-5 due to bony ankylosis. In his opinion, "This man was permanently and totally disabled due to his present back condition" and that it is going to become worse as time goes on. A contrary opinion was given by Doctor Holscher. There was competent and substantial evidence before the Commission as to the total and permanent disability of the claimant. We will not disturb the finding of the Commission on that point.

From a review of the whole record we find that there was sufficient competent evidence to warrant the award.

The judgment is affirmed.

HENLEY, P. J., and STORCKMAN, J., concur.

SEILER, J., not sitting.