**Steven SPENCER, Appellant,**

v.

**SAC OSAGE ELECTRIC CO–OP, INC., Respondent.**

**No. WD 70443.**

Missouri Court of Appeals, Western District.

Feb. 9, 2010.

---

Daniel J. Rice, Esq., and Lincoln J. Knauer, Esq., Springfield, MO, for appellant.

Jeffery T. Adams, Esq., Clinton, MO, for respondent.

Before: ALOK AHUJA, P.J., and JAMES M. SMART, JR. and LISA WHITE HARDWICK, JJ.

ALOK AHUJA, Judge.

Appellant Steven Spencer appeals a Final Award Denying Compensation issued by the Labor and Industrial Relations Commission. The Commission's Final Award upheld a decision of an Administrative Law Judge ("ALJ") in the Division of Workers' Compensation which denied Mr. Spencer's claim for workers' compensation benefits. For the reasons which follow, we reverse and remand for further proceedings consistent with this opinion.

## Factual Background[1]

Steven Spencer worked as a senior electrical lineman for respondent Sac Osage Electric Cooperative. Part of Spencer's job duties included replacing electrical transformers which had become damaged due to lightning strikes or removing transformers which were no longer needed. Transformers contain oil used to prevent overheating. This oil is sealed inside the transformer, but these seals can be broken by lightning strikes, which can result in the oil leaking out when the transformer is being moved. Mr. Spencer alleged that on approximately May 1, 1987, while removing a transformer, he accidentally spilled approximately a gallon of transformer oil over the front of his body from his neck to his knees. His clothing was saturated, including his jeans and underwear. Mr. Spencer continued to work in this oil-

---

1. We provide only a general summary of Mr. Spencer's medical history, and the evidence before the Commission. Nothing stated in this opinion should be read to pre-determine factual issues which the Commission must address on remand.

soaked clothing for the remainder of the workday, approximately seven to eight hours.

According to Mr. Spencer, he began feeling sick to his stomach and experiencing pain in his groin area later that day. Mr. Spencer saw a physician that evening and was given some medication. Despite the medication, the next day Mr. Spencer had a swollen left testicle and a fever of 102.2 degrees. Mr. Spencer was hospitalized from May 2 to May 9, 1987, and given intravenous antibiotics. He was released, but was rehospitalized from May 13 to May 21, 1987. Biopsies of swollen tissue from the penis and left testicle were analyzed, and a May 14, 1987 pathology report reflected "an inflammatory infiltrate deep in the dermis." The report also reflected that a hyperkeratosis was present on Mr. Spencer's penis. According to Mr. Spencer's expert witness, Dr. Norbert Belz, a hyperkeratosis is an area of excess dead skin cells which is slightly raised and is similar to a wart or a callus. Dr. Belz testified that the hyperkeratosis was unrelated to Mr. Spencer's employment. A biopsy of the hyperkeratosis was performed and determined to be non-cancerous. The surgeon's operative report noted "a very unusual inflammatory process involving the subcutaneous tissue of the scrotum and penis."

The swelling resolved and Mr. Spencer returned to work. Mr. Spencer again suffered swelling of his penis and scrotum, however, and after another biopsy was performed, he was diagnosed with sclerosing lipogranuloma of the penis and scrotum on October 14, 1988. The pathology report states that, "[s]clerosing lipogranuloma is an inflammatory reactive process to exogenous lipids and waxes gaining access to the dermis." [2]

On November 21, 1989, Mr. Spencer again experienced significant swelling of his penis, and again underwent a biopsy of his penile tissue. The biopsy showed sclerosing lipogranuloma involving the subcutaneous tissue of the penis, as well as staph in the subcutaneous tissue. Mr. Spencer's treating physician advised him that, according to medical literature, the primary cause of sclerosing lipogranuloma of the penis is injection of paraffins or waxes into the penis for purposes of enhancing erections and/or sexual performance. When asked if any substance had been injected into his penis, Mr. Spencer denied any injections.

Mr. Spencer claimed that he suffered another exposure to transformer oil on June 21, 1990, when he was unloading a lightning-damaged transformer and dropped it, causing fluid to splash out onto his belly and crotch area. He was hospitalized from July 5–10, 1990, and treated with antibiotics and steroids. On July 27, 1990, Mr. Spencer underwent surgical removal of swollen tissue. Five samples were taken from the excised tissue, and the diagnosis of sclerosing lipogranuloma was confirmed.

Mr. Spencer returned to work on August 20, 1990, at which time he suffered his last distinct exposure to transformer oil. He claimed that he pulled on a rope in the back of his truck that had been soaked in transformer oil, causing oil to get on his

---

2. Spencer's evidence was that he began to experience significant groin pain on the very day on which he worked for seven to eight hours in clothing and underclothing saturated with transformer oil, and that on the next day he experienced swelling of his left testicle and penis so severe that he was hospitalized for a week. Spencer experienced a similar episode in October 1988. Mr. Spencer nevertheless apparently did not inform his physicians of his exposure to transformer oil, or of the May 1, 1987 incident in particular, during either his 1987 or 1988 medical treatment.

hands. Later, with the oil still on his hands, he urinated and the oil was transferred from his hands to his penis. That day, Mr. Spencer sought treatment at an emergency room complaining of a "reaction to transformer oil." According to medical records, Mr. Spencer suffered from a "swollen hard penis," flushing of his face and arms, and complained of blurred vision and pain. Mr. Spencer was hospitalized for two days, subjected to "numerous laboratory procedures" and given intravenous antibiotics and "high doses of oral steroids." By the time he was discharged, the acute phase appeared to be over. Mr. Spencer was referred to an allergist, who recommended excision of a penile lesion and "meticulous avoidance of transformer oil." Although Mr. Spencer was ultimately cleared to return to work, Sac Osage terminated his employment on the grounds that it had no jobs available for him which would not involve potential exposure to transformer oil. Mr. Spencer never returned to any kind of work after his August 20, 1990 exposure. Since 1990 he has continued to experience medical problems associated with his sclerosing lipogranuloma, which we need not detail here.

Five experts testified in the case. The ALJ found that "the overall testimony of Dr. Belz and Dr. Belsito[, an expert retained by Sac Osage, was] the most logical testimony with regard to the issue of whether [Mr. Spencer's] sclerosing lipogranuloma was caused by his exposure to transformer oil."

Dr. Belz testified that a lipogranuloma forms in response to a lipid infiltrating to the deep dermal layer of the skin, or to the fatty tissue beneath it. The body first tries to destroy the foreign substance by attacking it with white blood cells. If the substance is not eliminated, the white blood cells encapsulate the foreign body within a protective coating. This causes the nodular granulomas. It is the nature of sclerosing lipogranuloma to wax and wane.

Dr. Belz testified that, in his opinion, Mr. Spencer's exposures to transformer oil while working for Sac Osage caused his sclerosing lipogranuloma. Dr. Belz testified that Mr. Spencer's oil-soaked clothing and underclothing, in which he continued to work for seven to eight hours following the May 1, 1987 spill, acted as the equivalent of an occlusive dressing, holding the transformer oil against Mr. Spencer's skin. Dr. Belz explained that occlusive dressings are used in the medical profession, and "massively increase[ ] the absorption of something that is relatively not absorbable." Dr. Belz noted that the May 14, 1987 pathology report did not find sclerosing lipogranuloma, but that the condition was noted in the October 14, 1988 pathology report. Dr. Belz testified that this time lapse was consistent with causation by the May 1, 1987 spill, because there is a five- to eighteen-month latency period between exposure to a foreign substance and development of sclerosing lipogranuloma. (Sac Osage's expert, Dr. Belsito, testified to a similar average latency period, of between six to fifteen months.)

Dr. Belz testified to multiple avenues through which the transformer oil could have infiltrated to the deep dermal layer of Mr. Spencer's penis. Thus, Dr. Belz testified that skin which is swollen, or has been compromised by a bacterial infection, is more permeable. Dr. Belz further testified that hair follicles can act as pathways for the infiltration of foreign materials into the dermal layer. He also testified that the hyperkeratosis on Mr. Spencer's penis could act as an exposure pathway. According to Dr. Belz, when a hyperkeratosis is on the penis, it will crack and fissure because the skin of the penis expands and

contracts. The presence of such cracked and fissured skin would allow further penetration of the transformer oil.[3] Finally, Dr. Belz testified that, when Mr. Spencer returned to work in 1987 and 1988 with stitches on his penis from surgical incisions and biopsies, this provided a further means for transformer oil to infiltrate to the dermis.

Dr. Belz's causation opinions relied, in significant measure, on his opinions concerning the nature and chemical composition of the transformer oil to which Mr. Spencer was exposed. Dr. Belz testified that Mr. Spencer reported to him, in 1998, that the transformer involved in the May 1, 1987 spill was a three kilovolt transformer that had been installed in the 1950s, approximately thirty years earlier, and had been stricken by lightning prior to its removal, causing holes to develop in the transformer, and its seals to be broken. Dr. Belz acknowledged that transformer oil, in its virgin state, is non-hazardous. However, he testified that "mineral oils when subject to heat and oxidation and time and . . . lightning strikes . . . will and do undergo hazardous decomposition and hazardous decomposition products are made." Dr. Belz testified that as transformer oil is repeatedly heated it will change its composition "from long thin carbon bonds to tight circles." The transformer oil "turn[s] into hundreds of organic acids and aromatic hydrocarbons and polycyclic . . . aromatic hydrocarbons." Dr. Belz testified that this decomposition was "important because the long skinny ones don't go through intact skin, and the tight circle ones go right on through . . . intact skin." "[T]hese changed and reformulated oils rapidly and easily penetrate skin. And when they rapidly and easily

penetrate skin, they will carry upon their back the other oils that are not as penetrable."

Dr. Donald Belsito, a dermatologist, testified on behalf of Sac Osage. Dr. Belsito initially opined that the cause of Mr. Spencer's sclerosing lipogranuloma was internal leakage of radiocontrast dye in a 1981 cystogram of Mr. Spencer's bladder. Dr. Belsito testified that he did not see any evidence that Mr. Spencer self-injected, although that could not be ruled out as a possibility. In later discovery, another witness testified that water-soluble dyes were typically used in cystograms in the 1980s. Dr. Belsito acknowledged that such water-soluble dyes would not cause sclerosing lipogranuloma. In a later deposition Dr. Belsito testified that in his opinion Mr. Spencer's sclerosing lipogranuloma was likely caused by self-injection.

Dr. Belsito opined that Mr. Spencer's employment at Sac Osage played no role in his development of sclerosing lipogranuloma. Dr. Belsito discussed a study which reported that when mineral oil was topically applied to pig skin, the majority of that oil got "hung up" in the dead layer of skin and that less than one percent reached the epidermal layer. Since less than one percent made it to the epidermal layer, Dr. Belsito believed that insufficient quantities of oil would go beyond the epidermal layer to the dermis and then through the dermis to the fatty layer to cause sclerosing lipogranuloma.

Dr. Belsito also discussed published case histories in which patients developed sclerosing lipogranuloma after each had, for a period of time, topically applied mineral oil or baby oil to penile skin. He pointed out

---

**3.** Dr. Belz's initial written reports and deposition testimony did not refer to the hyperkeratosis as a possible exposure pathway. He apparently first mentioned the theory that the

hyperkeratosis on Mr. Spencer's penis was cracked, providing the transformer oil with a pathway to the deep layers of the dermis, a week before the evidentiary hearing.

that all but one of these cases involved application of the oil to grossly damaged or ulcerated non-intact skin, and that no medical records reflected that Mr. Spencer's penile skin was abraded or otherwise non-intact on any of the occasions on which he was exposed to transformer oil. In the one case study that did not involve abraded skin, the individual had applied a chemical that enhanced penetration, distinguishing the situation from Mr. Spencer's.

Dr. Belsito found no indication that the hyperkeratosis on Mr. Spencer's penis was cracked or fissured, particularly to the depth necessary to permit infiltration of transformer oil to the deep dermal or fatty layers. To the contrary, Dr. Belsito testified that a hyperkeratosis is generally a *thickening* of the skin.[4]

Dr. Belsito's opinions were based in large part, if not exclusively, on exposure to transformer oil having a chemical composition similar to that described for new oil in the oil's Material Safety Data Sheets. Dr. Belsito acknowledged that he had no expertise concerning whether the chemical composition of transformer oil would change due to age and exposure to heat.

In Findings of Fact and Rulings of Law issued on November 1, 2007, the ALJ found Mr. Spencer to be a reliable and credible witness; nonetheless, he was denied compensation because "there was no means of transformer oil gaining access to the dermis of Claimant's penis." The ALJ further found that

> Dr. Belz' opinion that Claimant's hyperkeratosis on his penis was indeed cracked or fissured is the only evidence of that alleged fact. None of the medical records or path reports or testimony supports Dr. Belz' conclusion that the keratosis on Claimant's penis in May of 1987 was cracked, lacerated or fissured.... I simply cannot and do not find that there was any crack or fissure in the hyperkeratosis on Claimant's penis in 1987 that would have served as a pathway for the transformer oil to have possibly gained access to a deep enough level of the dermis of Claimant's penis to possibly cause his sclerosing lipogranuloma.

"Even given th[e] liberal standard of causation and proof [applicable to Mr. Spencer's pre–1993 injury], and the logical and clear testimony of Dr. Belz, I simply have too much doubt to conclude that Claimant in fact had any fissures or cracks on his penis to allow access of the oils into and beyond the epidermis."

The ALJ likewise rejected other avenues for transporting the oil to the dermal or fatty layers of Mr. Spencer's penis which Dr. Belz had hypothesized:

> The repeated swelling of the penis, allegedly allowing molecular amounts of oil access to the dermis is simply unbelievable. Similarly the theory that the oil was able to penetrate the hair follicles of the testicle and somehow reach the dermis due to the marinating and the oil being altered is also unbelievable. Nor do I find Claimant had any chafed or "acned" skin on his penis in 1987 which according to Dr. Belz may have allowed for penetration of the oil. Finally, I reject Dr. Belz' theory of oil penetration due to Claimant's touching his penis while urinating.

---

**4.** Despite his disagreement with Dr. Belz's ultimate causation opinions, Dr. Belsito appeared to agree with Dr. Belz on certain points, such as the ability of hair follicles to act as avenues to transport materials from the surface of the skin to the dermal or fatty layers; the greater permeability of skin that is swollen, or compromised by bacterial infection; the ability of hydrocarbons which reach the fatty layer to cause lipogranulomas; and the fact that hyperkeratotic skin can crack and fissure "like dried shoe leather."

The ALJ expressly refused to address Dr. Belz's testimony that the chemical composition of the transformer oil to which Mr. Spencer was exposed had been altered due to its years in service, increasing its ability to infiltrate into the skin:

> Because I have found that there was no means of transformer oil gaining access to the dermis of Claimant's penis, there is no need for me to determine or make findings as to whether transformer oil exposed to extreme heat and lightning would change in its molecular makeup to such an extent that it could more easily absorb into the skin to the level needed to cause sclerosing lipogranuloma.

The Commission (over the dissent of one of its members) affirmed the decision of the ALJ that awarded no compensation to Mr. Spencer, and in doing so adopted the ALJ's findings and conclusions. Mr. Spencer appeals.

### Standard of Review

The Missouri Constitution, article V, § 18 provides for judicial review of the Commission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record."

Section 287.495.1,[5] provides that, in reviewing a final decision of the Commission,

> [T]he court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

■■■ "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e. whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223. In employing this analysis, we are not required "to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award." *Id.*[6]

■■■ As previously mentioned, the Commission (over the dissent of one of its members) affirmed the decision of the ALJ that awarded no compensation to Spencer, and in doing so adopted the ALJ's findings and conclusions. "When the Commission affirms and adopts the ALJ's award, we review the ALJ's findings as adopted by the Commission." *ABB Power T & D Co. v. Kempker,* 236 S.W.3d 43, 48 (Mo.App. W.D.2007).

---

5. All statutory references are to RSMo 1986 unless otherwise indicated. Mr. Spencer's injuries occurred prior to significant changes to the Workers' Compensation statutes in 1993, and again in 2005; neither party disputes that the pre–1993 statute applies here. *See Conrad v. Jack Cooper Transp. Co.,* 273 S.W.3d 49, 50 n. 1 (Mo.App. W.D.2008) (citing *Van Winkle v. Lewellens Prof'l Cleaning, Inc.,* 258 S.W.3d 889, 894 (Mo.App. W.D.2008)).

6. In clarifying the proper standard of review, *Hampton* overruled a large number of prior appellate decisions on this discrete point of law. *Hampton,* 121 S.W.3d at 223, 224–32. We cite and rely on several such cases in this opinion for legal propositions unrelated to the standard of review, without further notation.

"This Court's interpretation of the workers' compensation act is informed by the purpose of the act, which is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment." *Schoemehl v. Treasurer of State,* 217 S.W.3d 900, 901 (Mo. banc 2007). "Accordingly, the law 'shall be liberally construed with a view to the public welfare.'" *Id.* (quoting § 287.800). "Any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." *Id.*

To be entitled to workers' compensation benefits, the employee has the burden of proving that his or her injury was caused by a work-related accident. *Tangblade v. Lear Corp.,* 58 S.W.3d 662, 666 (Mo.App. W.D.2001). "'Where the right to compensation depends upon which [of] two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination.'" *Williams v. DePaul Health Ctr.,* 996 S.W.2d 619, 631 (Mo.App. E.D.1999) (citation omitted). "Determinations with regard to causation and work-relatedness are questions of fact to be ruled upon by the Commission, and the reviewing court may not substitute its judgment on the weight of the evidence or on the credibility of witnesses for that of the Commission." *Bloss v. Plastic Enters.,* 32 S.W.3d 666, 671 (Mo.App. W.D. 2000) (citation omitted).

## Analysis

### I.

Mr. Spencer argues that the ALJ rejected uncontradicted medical testimony that his sclerosing lipogranuloma was caused by workplace exposure to transformer oil, and instead improperly relied upon her own lay opinion on the causation issue. In making this argument Spencer relies heavily on *Wright v. Sports Associ-* *ated, Inc.,* 887 S.W.2d 596, 600 (Mo. banc 1994), and cases following it, as well as on our recent decision in *Kliethermes v. ABB Power T & D,* 264 S.W.3d 626 (Mo.App. W.D.2008).

The ALJ rejected Dr. Belz's opinion that transformer oil reached the deep dermal layers of Mr. Spencer's penis and thereby caused his sclerosing lipogranuloma, and several of the specific transport mechanisms Dr. Belz identified: hair follicles, swollen skin, or a cracked and fissured hyperkeratosis.

To the extent that Mr. Spencer's claim involved exposure to "virgin" transformer oil similar in chemical composition to that described in the Material Safety Data Sheets for the oil, it may be that Dr. Belz's causation opinion were controverted by Sac Osage's principal causation expert, Dr. Belsito. As we described above, however, Dr. Belz's opinions were not based on the proposition that Mr. Spencer had been exposed to "virgin" transformer oil. Instead, he testified that the transformer oil to which Mr. Spencer had been exposed had been degraded, and its chemical composition altered, based on its length of service and exposure to lightning strikes and the elements. This was not simply an additional, alternative transport mechanism. Rather, Dr. Belz's claim that the oil was chemically degraded, and thus more easily absorbed, is a fundamental premise underlying his ultimate causation opinion, and his identification of particular pathways through which the transformer oil could have reached the deep dermal layer of Mr. Spencer's penis.

Yet, although she rejected Dr. Belz's conclusion regarding causation, and various of the specific exposure pathways Dr. Belz identified, the ALJ expressly refused to make findings as to whether the oil to which Mr. Spencer was exposed was degraded in the manner Dr. Belz described:

Because I have found that there was no means of transformer oil gaining access to the dermis of Claimant's penis, there is no need for me to determine or make findings as to whether transformer oil exposed to extreme heat and lightning would change in its molecular makeup to such an extent that it could more easily absorb into the skin to the level needed to cause sclerosing lipogranuloma.

Given that Dr. Belz's opinion concerning degradation of the transformer oil was tendered as an explanation of *how* the transformer oil gained access to the deep dermal tissue of Mr. Spencer's penis, this issue should have been addressed prior to, and as part of, determining whether the transformer oil had reached the dermis. Further, the ALJ's statement that she could reject Dr. Belz's causation opinions as unpersuasive, without deciding whether the chemical composition of the oil had been altered due to its age and use, suggests a fundamental misunderstanding of Dr. Belz's theory of causation. We fail to see how the ALJ could properly evaluate and assess the persuasiveness of Dr. Belz's opinions, in light of the contrary causation testimony of Sac Osage's witnesses, without addressing one of the critical considerations on which Dr. Belz's opinions were based.[7]

The issue the ALJ refused to decide concerns the fundamental nature of the substance to which Mr. Spencer was exposed. Although Sac Osage expert Dr. Belsito focused his opinions on exposure to transformer oil having a chemical composition similar to that described in the Mate-

rial Safety Data Sheets for the oil, Dr. Belz opined that Mr. Spencer was exposed to a fundamentally different substance, having different chemical characteristics and—crucially—different ability to infiltrate even intact human skin.

As Dr. Belz aptly observed: "[I]t is important for everybody who is going to form an opinion to know what in the world this man was exposed to." Yet the ALJ purported to find Dr. Belz's opinions unpersuasive without addressing this fundamental issue.

Without Commission findings as to the nature of the transformer oil to which Mr. Spencer was exposed, we cannot decide Mr. Spencer's claim that the Commission's rejection of his causation evidence was contrary to the overwhelming weight of the evidence. We recently faced a similar situation in *Stegman v. Grand River Regional Ambulance District*, 274 S.W.3d 529 (Mo.App. W.D.2008). *Stegman* involved the question whether an emergency medical technician sustained an injury "arising out of and in the course of [her] employment" within the meaning of § 287.120.1, RSMo Cum.Supp.2005, when her injury occurred in the garage of her home after receiving a page from her employer to respond to an emergency. The Commission in *Stegman* denied benefits, noting that the claimant " 'had not yet passed the "portal" of her abode at the time she fell in her garage.' " 274 S.W.3d at 532 (quoting Commission order). Having found claimant's physical location at the time of injury to be dispositive, the

---

7. We recognize that the ALJ continued the quoted passage by stating that, "[e]ven if the oil was altered as Dr. Belz suggested, I still do not find or believe that such oil could gain access to the dermis by way of intact skin— either on the scrotum or the penis." This statement directly contradicts Dr. Belz's testimony, which we have quoted above. In addi-

tion, it is not clear that Dr. Belz's opinion concerning the infiltration of degraded transformer oil into intact skin was contradicted by other witnesses, and therefore whether the ALJ was entitled to reject it under *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596, 600 (Mo. banc 1994), and similar cases.

Commission in *Stegman* failed to address other facts relevant to the nature of the claimant's employment, which this Court held were relevant to a determination whether her injuries arose out of, and in the course of, her employment. While it involved a different issue, the Court's discussion of the need for findings on the operative facts is equally applicable here:

> The Commission must fully develop and understand the pertinent facts to determine whether an injury arose "out of" and "in the course of" employment. Our cases, and sound reasoning, suggest that the analysis should commence with an understanding factually of the exact nature of the employment and the causal relation, if any, between the employment and the injury (as to whether the injury "arose out of" the employment), and whether there are pertinent facts that show that the employee at the time of the injury was at a location where the employee was required or permitted to be while reasonably fulfilling the duties of her employment (and thus "in the course of" employment).

*Id.* at 535.

> Here the Commission, without making findings pertinent to an understanding of how this employment worked, saw as dispositive one fact only: *that the Claimant had not left her house at the time of the injury.* Because we do not know how the Commission understood the nature of this employment and how the Commission understood the applicable legal theory, we are left with questions unanswered. The Claimant's arguments are interesting, but we cannot deal with them effectively without understanding the pertinent facts the Commission found were part of this employment. We must vacate the award and remand the matter to the Commission for findings of fact and conclusions

of law and any other proceedings not inconsistent with this decision.

*Id.* at 536.

We believe the same outcome is required here. On remand, the Commission must decide not only the historical facts concerning the transformer oil to which Mr. Spencer was exposed, but must also address Dr. Belz's opinions as to the changes in the chemical composition of that oil based on its service life and history (including his competence to offer those opinions). Only after addressing these issues can the Commission meaningfully evaluate the persuasiveness of Dr. Belz's medical causation opinions, in light of the other expert medical testimony and evidence in the record.

 In connection with our remand, we remind the Commission that, in this pre–1993 case, Mr. Spencer's burden is merely to establish a "reasonable probability that his injuries resulted from the accident to which he attributes them." *Davies v. Carter Carburetor, Div. ACF Indus., Inc.*, 429 S.W.2d 738, 749 (Mo.1968). "'Probability means founded on reason and experience which inclines the mind to believe but leaves room for doubt.'" *Cook v. Sunnen Prods. Corp.*, 937 S.W.2d 221, 223 (Mo.App. E.D.1996) (citations omitted); *see also Davies*, 429 S.W.2d at 749 (under "reasonably probability" standard, "[i]t is not essential that all doubt be removed"). We also emphasize that, "[i]n a workers' compensation proceeding the ALJ cannot substitute his or her own opinion for uncontroverted medical evidence regarding causation." *Elliott v. Kansas City, Mo., Sch. Dist.*, 71 S.W.3d 652, 657–58 (Mo.App. W.D.2002) (citing *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596, 599 (Mo. banc 1994)). Depending on the nature of the workplace exposure the Commission determines that Mr. Spencer

experienced, Dr. Belz's medical causation opinions may invoke this principle.

## II.

■■■ Sac Osage argues, in the alternative, that the Commission's denial of Mr. Spencer's claim can be affirmed based on the statute of limitations. Sac Osage argues that Mr. Spencer changed his theory of recovery from an accident, as alleged in his initial claim, to occupational disease in amended claims filed outside the limitations period, and that his amended claims do not relate back to the filing of his original claim.[8] We disagree.

In his original claim, Mr. Spencer stated "O/A June 21, 1990" in the the space provided for specification of the "Date of Accident/Incidence of Occupational Disease." Mr. Spencer alleged "[p]ermanent injury and disability to the body as a whole," caused by the fact that "[e]mployee, in the course and scope of his employment, was caused to come into direct contact with transformer oils, suddenly, unexpectedly, and without warning, all directly and violently resulting in the aforesaid injury and disability."

The Workers' Compensation Law provides that "[a]ll proceedings before the commission or any commissioner shall be simple, informal and summary, and without regard to the technical rules of evidence, and no defect or irregularity therein shall invalidate the same." § 287.550. Consistent with this general principle,

> A claim need not state facts sufficient to state a claim for relief, and the original jurisdiction of the Commission is ordinarily not dependent upon statements in a claim.

In Workers' Compensation proceedings, substantial compliance with the provisions of the Compensation Act is ordinarily sufficient. "Procedural rights are considered as subsidiary and substantive rights are to be enforced at the sacrifice of procedural formality." Thus the claim or application contemplated by the Workers' Compensation Act does not have to contain the usual elements of a petition in the civil action.

*Loyd v. Ozark Elec. Co–op., Inc.,* 4 S.W.3d 579, 586 (Mo.App. S.D.1999) (quoting *Groce v. Pyle,* 315 S.W.2d 482, 492 (Mo. App.1958)). The claim, however, must provide sufficient information such that the " 'employer [and] the Commission [are] advised of the nature of the employee's claim.' " *Groce,* 315 S.W.2d at 492–93 (citation omitted).

■■■ Here, by using the abbreviation "O/A," Mr. Spencer's original claim referred, albeit summarily and informally, to an injury caused by either an occupational disease or accident, resulting from his "direct contact with transformer oils" occurring in the course and scope of his employment. His subsequent amendments of this claim, which amplified and provided additional details as to the specific nature of his claim, did not change the alleged nature or cause of his injuries, and accordingly relate back to the date of the original filing. "[T]he general rule is that if the only effect of the amendment made after the running of the limitation period is to perfect or amplify the claim set up in the original pleading, the amendment relates back to the time of the commencement of the original action so as to be saved from the bar of the statute...." *Ford v. Am. Brake Shoe Co.,* 252 S.W.2d 649, 652 (Mo.

---

8. Sac Osage also argues that Mr. Spencer's separate claim for a back injury is barred by the statute of limitations. Because Mr. Spencer does not challenge the Commission's denial of his claim for a back injury here, we need not address this additional limitations issue.

App.1952). In *Ford*, the claimant filed a claim for an accidental injury sustained in October 1948, when he "swallowed some sand," while working for the employer. *Id.* at 651–52. The claim was filed on November 13, 1948. *Id.* at 650. On June 7, 1950, claimant amended the claim by adding that "while claimant was engaged in his usual duties as a shake-out man, he contracted an occupational disease [silicosis] by reason of the inhalation of harmful substances." *Id.* at 651. The employer argued that the amended claim was barred by the statute of limitations. *Id.*

> In other words, the employer argues that the amended claim of occupational disease constituted a complete departure from the original claim of accidental injury, and was consequently not to be saved from the bar of the statute by reason of any conclusion that the original claim was filed in time.

*Id.* Ford testified that he had occupied the position resulting in his exposure to silica dust from March 18, 1946, through September 28, 1948. *Id.* His testimony indicated that he began to suffer weakness and shortness of breath, and began to miss approximately one day of work per week, in June 1947, and associated his physical difficulties with his employment at that time. The court nevertheless rejected the employer's argument that the 1950 amendment constituted a wholly new and distinct claim so as to not relate back to Ford's original 1948 claim (which apparently referred to only a single incident, in October 1948, in which Ford had "swallowed some sand"): "[w]hether before or after the amendment, the thing in controversy was the condition attending the employment" which had resulted in an injury to the employee's chest and lungs. *Id.* at 652–53. The Court concluded that "[t]he actual effect of the amendment was merely to perfect the statement of the original claim; and the amendment consequently related

back to the institution of the proceeding as regards the running of the statute of limitations." *Id.* at 653.

As in *Ford*, Mr. Spencer's subsequent amendments did not state a new and distinct claim, but merely perfected and amplified the statement of his original claim. Those amendments accordingly related back to the filing date of his original claim, and we reject the alternate ground for affirmance asserted by Sac Osage.

### Conclusion

Because we conclude that controlling factual issues remain undecided, and are appropriately addressed by the Commission in the first instance, we vacate the Commission's Final Award, and remand to the Commission for further proceedings consistent with this opinion.

All concur.